2023 IL App (1st) 220322
Opinion filed December 1, 2023
Fifth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CR 3050 |
| | ) | |
| JUSSIE SMOLLETT, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court, with opinion.
Justice Coghlan concurred in the judgment and opinion.
Justice Lyle dissented, with opinion.

**OPINION**

¶ 1      A grand jury returned an indictment against defendant Jussie Smollett on 16 counts of felony disorderly conduct stemming from his false reporting to Chicago police officers that he had been the victim of a racist and homophobic attack near downtown Chicago. Thereafter, the Cook County State's Attorney's Office (CCSAO) nol-prossed the case against him. However, after the appointment of a special prosecutor, a special grand jury reindicted Smollett on six counts of felony disorderly conduct based on similar allegations. Following a jury trial, Smollett was found guilty of 5 counts of felony disorderly conduct and sentenced to 30 months' probation, with the first 150

days of probation to be served in jail. Smollett was also ordered to pay a $25,000 fine and $120,106 in restitution to the City of Chicago. On appeal, Smollett challenges virtually every aspect of the second prosecution that resulted in his convictions and sentence. For the following reasons, we affirm Smollett's convictions and sentence.

¶ 2                                    I. BACKGROUND

¶ 3       In February 2019, the CCSAO filed a criminal complaint against Smollett for felony disorderly conduct. Smollett turned himself in to the Chicago police the next day and posted a $10,000 bond. Thereafter, a grand jury returned a true bill of indictment against him for felony disorderly conduct, and the CCSAO filed a 16-count indictment against him. The indictment alleged that Smollett falsely reported to Chicago police that he had been physically attacked by two men shouting racist and homophobic slurs. Smollett pled not guilty.

¶ 4       On March 26, 2019, the State advanced Smollett's scheduled status hearing and presented an oral motion to nol-pros the charges against him. In court, an assistant state's attorney stated:

> "After reviewing the facts and circumstances of the case, including Mr. Smollett's volunteer service in the community and agreement to forfeit his bond to the City of Chicago, the State's motion in regards to the indictment is to nolle pros [*sic*]. We believe this outcome is a just disposition and appropriate resolution to this case."

The trial court granted the motion and ordered the clerk of the circuit court of Cook County to release Smollett's bond to the City of Chicago.

¶ 5       In April 2019, a retired appellate court justice filed a *pro se* petition to appoint a special prosecutor to "investigate and prosecute the People of the State of Illinois v. Jussie Smollett." The petition was docketed as a new case and subsequently assigned to be heard by Judge Michael P.

Toomin. On June 21, 2019, over the objection of the CCSAO, Judge Toomin ordered that "a special prosecutor be appointed to conduct an independent investigation of the actions of any person or office involved in all aspects of the case entitled People of the State of Illinois v. Jussie Smollett, No. 19 CR 03104[-]01, and if reasonable grounds exist to prosecute Smollett, in the interest of justice the special prosecutor may take such action as may be appropriate to effectuate that result." Judge Toomin further found that "the unprecedented irregularities identified in this case warrant[ ] appointment of an independent counsel to restore the public's confidence in the integrity of our criminal justice system."

¶ 6 The following month, Smollett filed several motions before Judge Toomin, including a motion for reconsideration of the appointment order and a motion to intervene *instanter*. In denying Smollett's motion to intervene, Judge Toomin clarified that "the order of June 21[, 2019] *** only enables a Special Prosecutor to conduct an independent investigation and re-prosecution is not ordered, but may occur only if additional considerations are met, *i.e.*, reasonable grounds exist to re-prosecute Mr. Smollett, and it's in the interest of justice." Judge Toomin also emphasized that the June 21, 2019, appointment order "was not an interim order." Smollett did not appeal the June 21, 2019, order.

¶ 7 On August 23, 2019, Judge Toomin appointed Dan K. Webb as "Special Prosecutor *** to conduct an independent investigation of the actions of any person or office involved in all aspects of the case entitled the People of the State of Illinois v. Jussie Smollett, No. 19 CR 0304[-]01, and if reasonable grounds exist to further prosecute Smollett, in the interest of justice the special prosecutor may take such action as may be appropriate to effectuate the result." Smollett did not appeal the August 23, 2019, order.

¶ 8    In February 2020, a special grand jury indicted Smollett on six counts of felony disorderly conduct for falsely reporting that he had been the victim of a racial and homophobic attack. Later that month, Smollett was arraigned and pled not guilty. On that same date, Smollett filed an emergency motion for a supervisory order in the Illinois Supreme Court asking the court to vacate the orders appointing Webb as special prosecutor. The following month, the Illinois Supreme Court denied Smollett's emergency motion.

¶ 9    Smollett then filed several motions in the trial court seeking the dismissal of the second indictment on various grounds, including the alleged violation of double jeopardy principles, challenging the validity of the special prosecutor's appointment, and asserting a violation of an "agreement" with the CCSAO to dismiss his original case, all of which were subsequently denied. Olabinjo "Ola" Osundairo and Abimbola "Bola" Osundairo, the two brothers alleged to have assisted Smollett in staging the attack, moved to intervene and disqualify Smollett's lead defense attorney, Nenye Uche (attorney Uche), from representing Smollett because he had previously consulted with them regarding the facts of this case. Following an evidentiary hearing, the trial court ruled that attorney Uche could "appear as counsel for Smollett," but other members of the defense team would be required to cross-examine the Osundairo family members at trial. Smollett also moved to obtain notes from a meeting the Office of the Special Prosecutor (OSP) had with the Osundairo brothers, but the court denied that motion.

¶ 10    The evidence introduced at trial established that, in the early morning hours of January 29, 2019, Chicago police officer Muhammad Baig responded to Smollett's high-rise condominium near downtown Chicago to investigate a report from Smollett's "creative manager" that Smollett had been the victim of a crime. Smollett reported to Officer Baig that two unknown individuals yelling racial and homophobic slurs had physically attacked him. While receiving medical

- 4 -

treatment at Northwestern Memorial Hospital, Smollett repeated the same allegations to Detectives Kimberly Murray and Robert Graves. The police later identified two suspects matching Smollett's description of the alleged offenders from security video footage showing two suspects exiting an Uber, entering a taxicab, and arriving near the crime scene moments before the alleged attack occurred. Uber records confirmed that Ola had ordered the Uber observed in the video. After being arrested on February 13, 2019, the Osundairo brothers admitted staging an attack against Smollett at his request. When Detectives Murray and Graves reinterviewed Smollett the next day, he reiterated the same allegations previously reported to the police.

¶ 11    At trial, the Osundairo brothers both testified that they participated in a staged hate crime orchestrated by Smollett. Bola testified that Smollett staged the attack because he was unhappy that his television studio was not taking hate mail he had previously received seriously. Other evidence introduced at trial included messages between the Osundairo brothers and Smollett, cell phone GPS data, video evidence, receipts for the items used in the staged attack, and a $3500 check from Smollett made out to Bola.

¶ 12    Smollett testified in his own defense that he was attacked by two offenders on January 29, 2019. He denied that he had paid the Osundairo brothers to help him stage a fake hate crime. Other witnesses called by Smollett included his former manager, Brandon Moore, who had been on the phone with Smollett at the time the alleged attack occurred, and Dr. Robert Turelli, a Northwestern Memorial Hospital physician who treated Smollett for head injuries after the alleged attack.

¶ 13    The jury found Smollett guilty of five counts of felony disorderly conduct. After a sentencing hearing, the trial court sentenced him to 30 months' probation, with the first 150 days of his sentence to be served in the Cook County Jail. He was also ordered to pay a $25,000 fine and $120,106 in restitution to the City of Chicago.

¶ 14                               II. ANALYSIS

¶ 15                    A. Appointment of the Special Prosecutor

¶ 16    Smollett contends that (1) statutory authority was lacking for the appointment of a special prosecutor, (2) the appointment order was vague and overbroad, (3) the appointment was not statutorily allowed, and (4) the circuit court erred in denying defense counsel's motion for a substitution of judge. The OSP responds that this court lacks jurisdiction over these issues because they did not arise in the case currently on appeal.

¶ 17    The petition seeking appointment of a special prosecutor was filed on April 5, 2019. The case number assigned to that case was 19 MR ("Miscellaneous Remedies") 00014. On June 21, 2019, Judge Toomin granted the petition to appoint a special prosecutor. Smollett did not appeal that order.

¶ 18    On July 19, 2019, Smollett moved to intervene in case number 19 MR 00014 *instanter*, arguing that pursuant to section 2-408 of the Code of Civil Procedure (735 ILCS 5/2-408 (West 2018)), he was a nonparty directly affected by the proceedings. He also moved for reconsideration of the June 21, 2019, order appointing a special prosecutor and for a substitution of judge. In denying Smollett's motion to intervene on July 31, 2019, Judge Toomin stated that the June 21, 2019, appointment order "was not an interim order." Smollett's other motions were also denied. Smollett did not appeal those orders.

¶ 19    On August 23, 2019, Judge Toomin appointed Webb as the special prosecutor and ordered him to conduct an independent investigation of actions of any person or office involved in the original case (19 CR 03104-01). Judge Toomin also ordered Webb to further prosecute Smollett if there were reasonable grounds. Smollett did not appeal that order.

¶ 20    On February 11, 2020, the special grand jury returned an indictment against Smollett charging him with six counts of felony disorderly conduct. See *People v. Smollett*, No. 20 CR 3050. On February 24, 2020, Smollett was arraigned and pled not guilty. That same day, Smollett filed an emergency motion in the Illinois Supreme Court in case number 19 MR 00014, seeking a supervisory order to vacate the June 21, 2019, order appointing a special prosecutor and the August 23, 2019, order appointing Webb as the special prosecutor. The Illinois Supreme Court denied Smollett's emergency motion.

¶ 21    In July 2020, Smollett filed a motion to dismiss the second indictment alleging the invalid appointment of the special prosecutor. In denying Smollett's motion, the trial court noted that the "case filed in 2019 was a totally different case number, a totally different proceeding ***. I don't see any possible way that I would have authority at this level to revisit Judge Toomin's ruling. *** So it's denied on that ground."

¶ 22    Similarly, this court has no authority to review the orders issued in case number 19 MR 00014. Because an appeal is a continuation of the circuit court proceeding, the "notice of appeal cannot vest jurisdiction in this court over an order entered in a different proceeding." *Lee v. Pavkovic*, 119 Ill. App. 3d 439, 444 (1983) (cannot review order that was "not part of the judgment appealed from, but instead was entered in another case"). "Unless there is a properly filed notice of appeal, a reviewing court has no jurisdiction over the appeal and is obliged to dismiss it." *People v. Smith*, 228 Ill. 2d 95, 104 (2008). A "notice of appeal confers jurisdiction on a court of review to consider only the judgments or parts thereof specified in the notice of appeal." *Id.*

¶ 23    Smollett failed to file a timely notice of appeal from either the June 21, 2019, or the August 23, 2019, orders entered by Judge Toomin in case number 19 MR 00014. See Ill. S. Ct. R. 606(b) (eff. Mar. 12, 2021) (a notice of appeal must be filed with the clerk of the trial court within 30 days

after the entry of the final judgment appealed from). As "the filing of the notice of appeal is jurisdictional" (Ill. S. Ct. R. 606(a) (eff. Mar. 12, 2021)), this court lacks jurisdiction to review orders entered in case number 19 MR 00014 in this appeal, which involves case number 20 CR 3050.

¶ 24    Smollett's argument that he was unable to appeal the orders entered in case number 19 MR 00014 because he was not a party to that case is without merit. Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) "has been construed to allow even a nonparty to appeal" so long as the nonparty has a "direct, immediate, and substantial interest in the subject matter, which would be prejudiced by the judgment or benefitted by its reversal." (Internal quotation marks omitted.) See *In re Appointment of Special Prosecutor*, 388 Ill. App. 3d 220, 230 (2009). Pursuant to Rule 301, Smollett qualified as a nonparty who could have appealed. Instead, he waited nearly six months after the final order was issued in case number 19 MR 00014, and after he had been reindicted, to contest these orders. For the reasons stated here, we do not have jurisdiction to review these orders.

¶ 25           B. Due Process Right and Alleged Nonprosecution Agreement

¶ 26    On October 14, 2021, Smollett filed another motion to dismiss the indictment, alleging that the State breached an "immunity type non-prosecution agreement" by reindicting him, in violation of "his 'right not to be hauled into court' on the same charges." Generally, we review the trial court's ruling on a motion to dismiss charges under an abuse of discretion standard. *People v. Stapinski*, 2015 IL 118278, ¶ 35. However, where the issues are purely legal questions, our standard of review is *de novo*. *Id.* In this case, Smollett is alleging a denial of due process and claims that denial was sufficiently prejudicial to require the dismissal of the charges against him. These are questions of law, which we review *de novo*. *Id.*

¶ 27    Smollett argues that he performed his part of the alleged nonprosecution agreement with the CCSAO by performing community service and forfeiting his $10,000 bond. He asserts that the "record is clear, that Cook County prosecutors had an *intention* and indeed an *agreement* to bargain away the State's ability to re-prosecute [him] in exchange for [his] $10,000 bail bond and [his] performance of community service." (Emphasis in original.) We disagree.

¶ 28    The record does not establish that Smollett entered into a nonprosecution agreement with the CCSAO, in which the CCSAO agreed to forgo further prosecution of him in exchange for his performance of community service and the forfeiture of his bond. On the contrary, the record clearly shows that on March 26, 2019, the CCSAO stated in court that it had reviewed Smollett's "volunteer service in the community and agreement to forfeit his bond to the City of Chicago" in making "the State's motion *** to *nolle pros* [*sic*]." (Emphasis added.). At oral argument, Smollett agreed that the only indication in the record of the "agreement" between him and the CCSAO is the transcript of the March 26, 2019, court proceeding.

¶ 29    Under well-established Illinois law, "[a] *nolle prosequi* is not a final disposition of the case, and will not bar another prosecution for the same offense." (Internal quotation marks omitted.) *People v. Milka*, 211 Ill. 2d 150, 172 (2004). "The decision to nol-pros a charge lies within the discretion of the prosecutor, and a trial court may not deny the motion under normal circumstances." *People v. Murray*, 306 Ill. App. 3d 280, 282 (1999). A *nolle prosequi* "is not an acquittal, but it is like a nonsuit or discontinuance in a civil suit, and leaves the matter in the same condition in which it was before the commencement of the prosecution." (Internal quotation marks omitted.) *Milka*, 211 Ill. 2d at 172. If a *nolle prosequi* "is entered before jeopardy attaches, the State may reprosecute the defendant subject to other relevant statutory or constitutional defenses" absent fundamental unfairness, bad faith or harassment. *People v. Hughes*, 2012 IL 112817, ¶ 23

(citing *People v. Norris*, 214 Ill. 2d 92, 104 (2005)). "Once a charge is nol-prossed, the proceedings are terminated with respect to the particular charge, and the defendant is free to go 'without entering into a recognizance to appear at any other time.' " (Internal quotation marks omitted.) *Id.* (quoting *Norris*, 214 Ill. 2d at 104).

¶ 30    Here, the State's *nolle prosequi* of the indictment was not a final disposition of the case, and as will be discussed below, jeopardy did not attach. Therefore, the State was not barred from reprosecuting Smollett. After the *nolle prosequi* was entered, Smollett was free to go without entering into a recognizance to appear at any other time, which is the bargain Smollett made. There is no ambiguity as to what occurred between Smollett and the CCSAO, and contrary to the dissent's position, further proceedings are not necessary to add clarity.

¶ 31    As thoroughly explained by the OSP:

"Throughout this action, Smollett has offered numerous, different—and oftentimes, conflicting—framings of the purported 'agreement' that was struck with the CCSAO on March 26, 2019. For example, in the trial court, Smollett called the disposition reached on March 26, 2019 an 'informal agreement' [citation], 'analogous to a negotiated plea agreement' [citation], a 'negotiated agreement' [citation], 'effectively' pretrial diversion [citation], a 'contractual immunity agreement' [citation], and an 'immunity-type agreement.' [Citation.] In this appeal, Smollett has tossed aside these previous descriptions and landed on 'non-prosecution agreement.' [Citation.] But the record supports only one conclusion—Smollett bargained for and received a *nolle prosequi*, which legally cannot bar the prosecution of Smollett in this case."

¶ 32    Presumably relying on principles of contract law, the dissent asserts that "the rights of the State in a *unilateral nolle*" can be "bargain[ed] away" when "making a *bilateral agreement.*"

(Emphases added.) However, no Illinois court has ever applied principles of contract law in interpreting the scope of a *nolle prosequi* disposition in a criminal case.

¶ 33    Unlike in the instant case, in *People v. Smith*, 233 Ill. App. 3d 342, 347 (1992), the prosecutor advised the trial court that there would be an "outright dismissal" if the defendant met her expectations of a "cooperation-immunity" agreement. The defendant fulfilled her obligations under the agreement, and the State voluntarily dismissed charges based on the defendant's cooperation. *Id.* at 345-47, 349. When the State reindicted the defendant more than a year later, the trial court dismissed the new indictment, finding that, "by moving to dismiss the charges, the prosecutor acknowledged the receipt of the benefit from [the] defendant's performance." *Id.* at 345-46. The court expressly held that the "prosecutor's use of the phrase 'outright dismissal' indicated that the prosecutor intended the dismissal to be an acquittal, not a *nolle prosequi*." *Id.* at 346. Under those circumstances, the trial court found that reindicting the defendant violated due process. *Id.* at 346-47. On appeal, the reviewing court agreed, noting that, "[o]nce the State elected to dismiss the charges, *the dismissal was to be absolute*" and "[i]f a *nolle prosequi* had been intended, it is likely that the charges would have been nol-prossed" at the hearing. (Emphasis added.) *Id.* at 348.

¶ 34    In *Stapinski*, 2015 IL 118278, ¶¶ 16, 25, the defendant entered into a cooperation agreement with a police officer in which he agreed to cooperate in the arrest of two individuals in exchange for not being charged with possession of a controlled substance. When the defendant was later indicted for this offense, the trial court found that his due process rights had been violated because he had fulfilled his part of the bargain and had incriminated himself based on the promises made to him. *Id.* ¶¶ 25, 55. Our supreme court agreed, finding that the "defendant's substantive

due process rights were violated when the State breached" his agreement with the police officer. *Id.* ¶ 52.

¶ 35    Unlike in *Stapinski*, Smollett did not enter into a "cooperation agreement" with the CCSAO. See *id.* ¶ 46 (explaining that "[c]ooperation agreements are neither plea agreements nor a grant of immunity. [Citation.] They arise when the State agrees to limit a prosecution in some manner in consideration for the defendant's cooperation."). In addition, the terms of the *Stapinksi* cooperation agreement provided that, if the defendant cooperated in the arrests of two individuals, he would not be charged. *Id.* ¶ 25. In contrast, Smollett had already been indicted prior to the CCSAO's motion to nol-pros the charges pending against him, and the record does not contain any evidence that the CCSAO agreed Smollett would not be further prosecuted in exchange for forfeiting his bond and performing community service.

¶ 36    In *People v. Starks*, 106 Ill. 2d 441, 443-44 (1985), after being found guilty of armed robbery, the defendant alleged that the state's attorney's office had agreed before trial to dismiss the charge if he passed a polygraph examination. The defendant alleged he submitted to and passed the test based on that representation. *Id.* at 444. Our supreme court found that, "[i]f there was an agreement as alleged, and if [the defendant] fulfilled his part of it, then the State must fulfill its part" and, "[b]y submitting himself to the polygraph examination, the defendant surrendered his fifth amendment privilege against self-incrimination." *Id.* at 451-52.

¶ 37    Unlike in *Starks*, where the defendant testified at the posttrial hearing that the prosecution told him that if he took and passed a polygraph examination, the charge would be dismissed, the record in this case is silent regarding any nonprosecution agreement between the CCSAO and Smollett. No questions are left by the State's actions on that date. As previously discussed, the

only disposition requested by the CCSAO at the March 26, 2019, hearing was to "nolle pros" the indictment, which does not impart finality.

¶ 38    Similarly, in *People v. Marion*, 2015 IL App (1st) 131011, ¶¶ 31, 34, 38-39, a police officer offered not to arrest the defendant for narcotics possession in exchange for his cooperation in helping to find and produce handguns, which the defendant accepted and then fulfilled his part of the bargain. We found that the defendant proved that there was "an enforceable agreement" and that the "police had actual authority to promise not to arrest [the defendant] in exchange for his cooperation." *Id.* ¶ 39.

> " '[T]o allow the government to receive the benefit of its bargain without providing the reciprocal benefit contracted for by the defendant would do more than violate the private contractual rights of the parties—it would offend all notions of fairness in the related criminal proceedings, which are protected by constitutional due process.' " *Id.* ¶ 38 (quoting *Commonwealth v. Sluss*, 419 S.E.2d 263, 265 (Va. Ct. App. 1992)).

In contrast, the record in the instant case establishes that on March 26, 2019, the CCSAO only agreed to nol-pros the charges against Smollett.

¶ 39    Accordingly, Smollett has failed to establish a due process violation based on the alleged existence of a nonprosecution agreement.

¶ 40                                   C. Double Jeopardy

¶ 41    Smollett also contends that the trial court erred in denying his motion to dismiss the second indictment based on the violation of his right against double jeopardy. Generally, we review the trial court's ruling on a motion to dismiss based on double jeopardy grounds for an abuse of discretion. *People v. Jimenez*, 2020 IL App (1st) 182164, ¶ 10. However, where, as here, there are

no disputed factual issues, our review is *de novo*. *People v. Staple*, 2016 IL App (4th) 160061, ¶ 12.

¶ 42    The double jeopardy clause of the fifth amendment of the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The Illinois Constitution also prohibits double jeopardy. See Ill. Const. 1970, art. I, § 10. Illinois courts interpret our double jeopardy clause identically to the federal counterpart. *People v. Kimble*, 2019 IL 122830, ¶ 28. The double jeopardy clause provides three discrete shields: "barring retrial for the same offense after an acquittal, retrial after a conviction, and multiple punishments for the same offense." *Id.*

¶ 43    The threshold inquiry is whether jeopardy had previously attached. *People v. Bellmyer*, 199 Ill. 2d 529, 537-38 (2002); see *People ex rel. Mosley v. Carey*, 74 Ill. 2d 527, 534 (1979) (observing that "[t]he starting point in any double jeopardy analysis, of course, is determining whether or not jeopardy had attached"). "The protections against double jeopardy are triggered only after an individual has been subjected to the hazards of trial and possible conviction." *People v. Shields*, 76 Ill. 2d 543, 546 (1979). In a jury trial, jeopardy attaches when the jury is impaneled and sworn. *Bellmyer*, 199 Ill. 2d at 538. In a bench trial, jeopardy attaches upon the first witness being sworn in and the trial court beginning to hear evidence. *Id.* And, in the context of a guilty plea, jeopardy attaches when the court accepts the defendant's guilty plea. *Id.*

¶ 44    In the instant case, 12 days after Smollett's first arraignment, the State nol-prossed his case. No jury had been impaneled, no witness had been sworn in, no evidence had been introduced, and Smollett had not pled guilty. Because none of these actions occurred, jeopardy did not attach to Smollett's first criminal prosecution. See *id.* Smollett erroneously argues that jeopardy attached when Judge Steven Watkins accepted the negotiated disposition between him and the CCSAO in

the original case, involving his performance of community service and forfeiture of his $10,000 bond. Smollett relies on several decisions from other states to support his argument that the negotiated disposition was tantamount to an alternative or deferred prosecution or a pretrial diversion program. In addition to the fact that decisions from foreign jurisdictions are not binding on this court (see *People v. Wright*, 2013 IL App (1st) 103232, ¶ 66), the record does not show that Smollett ever enrolled in or completed an alternative or deferred prosecution or a pretrial diversion program, as such programs require strict formalities, none of which were present here. See 730 ILCS 5/5-6-3.3 (West 2018) (describing the requirements for the Offender Initiative Program, a program eligible for defendants charged with nonviolent crimes, including disorderly conduct); Cook County Cir. Ct. G.A.O. 11-03 (Feb. 17, 2011) (describing the requirements for the Cook County State's Attorney's Deferred Prosecution Program); Cook County Cir. Ct. G.A.O. 11-06 (Feb. 28, 2011) (same).

¶ 45 Jeopardy protects the integrity of the finality of judgments. See *United States v. Scott*, 437 U.S. 82, 92 (1978). The CCSAO's *nolle prosequi* of the first case against Smollett did not represent a final judgment because, as previously discussed, a *nolle prosequi* "is not a final disposition of the case, and will not bar another prosecution for the same offense" as "[i]t is not an acquittal." (Internal quotation marks omitted.) *Milka*, 211 Ill. 2d at 172. Also as previously discussed, if a *nolle prosequi* "is entered before jeopardy attaches, the State may reprosecute the defendant subject to other relevant statutory or constitutional defenses" and absent fundamental unfairness, bad faith, or harassment. *Hughes*, 2012 IL 112817, ¶ 23.

¶ 46 Given the absence of a nonprosecution agreement with the CCSAO, reprosecuting Smollett was not fundamentally unfair. Because the charges against Smollett were nol-prossed before jeopardy had attached in the first criminal proceeding, the subsequent prosecution did not violate

his right against double jeopardy. Smollett's reliance on *United States v. Chouteau*, 102 U.S. 603, 610 (1880), in which the defendant's penalty was " 'in full satisfaction, compromise, and settlement' " of the indictment, is misplaced. In the instant case, the forfeiture of Smollett's $10,000 bond to the City of Chicago was not in full satisfaction of the costs the city incurred in investigating his reporting of a crime, which the City of Chicago alleges exceeded $100,000.

¶ 47    Smollett also argues that his convictions violated the spirit of the double jeopardy clause and should be reversed on public policy grounds. Smollett repeatedly cites *Illinois v. Somerville*, 410 U.S. 458 (1973), for the proposition that the application of double jeopardy principles should not be done in a rigid, mechanical manner. In *Somerville*, 410 U.S. at 459-60, after the defendant was indicted and a jury was impaneled, the State realized the indictment was fatally deficient and, under the law at the time, could not be cured. After the State informed the trial court of this flaw, the court granted the State's motion for a mistrial. *Id.* at 460. Thereafter, the defendant was indicted for a second time, and the second indictment corrected the flaw of the first indictment. *Id.* A jury found the defendant guilty, and ultimately, the issue of double jeopardy reached the United States Supreme Court. *Id.* at 460-61. In analyzing whether the trial court's declaration of a mistrial barred the State from retrying the defendant with a valid indictment, the Court made multiple references to eschewing rigid and mechanical rules in a double jeopardy analysis. *Id.* at 462, 467.

¶ 48    More recently, in *Martinez v. Illinois*, 572 U.S. 833, 839-40 (2014), the Court reiterated that there are clear, bright-line rules as to *when* jeopardy attaches. In fact, the court rejected any argument that *Somerville* stood for the proposition that whether jeopardy had attached was subject to flexibility. *Id.* at 840. The Court observed that, in *Somerville*, it "declined to apply 'rigid, mechanical' reasoning in answering a very different question: not whether jeopardy had attached, but whether the manner in which it terminated (by mistrial) barred the defendant's retrial." *Id.*

(quoting *Somerville*, 410 U.S. at 467). *Martinez* demonstrates that Smollett's use of public policy arguments cannot change the bright-line rule that jeopardy never attached to his first criminal proceeding. Consequently, the trial court properly denied Smollett's motion to dismiss based on double jeopardy grounds.

¶ 49                    D. Conflict of Lead Defense Counsel

¶ 50    The Osundairo brothers filed a motion to disqualify attorney Uche from representing Smollett in this case based on a conflict of interest. They asserted that on February 19, 2019, and February 20, 2019, attorney Uche "held two distinct [telephone] consultations with [them]." They also alleged that attorney Uche had discussed the facts of this case with their mother, Ola Adeola Osundairo.

¶ 51    Attorney Uche advised the trial court that the affidavits attached to the motion to disqualify were not accurate and that he "did not talk to the brothers on the phone," had "never met the brothers in my life," and did "not know what they sound like." At attorney Uche's request, the court held an *ex parte* meeting with attorney Gloria Rodriguez, the attorney for the Osundairo brothers, regarding the information they allegedly discussed with attorney Uche.

¶ 52    The OSP filed its bill of particulars, in which it asserted that attorney Uche "had at least four distinct conversations" with Ola about the case over the phone, with Bola being present for at least two of those conversations.

¶ 53    The court held an *in camera* evidentiary hearing on the motion to disqualify attorney Uche from representing Smollett. Ola, Bola, and Ms. Osundairo were the only witnesses who testified at the evidentiary hearing.

¶ 54    The court entered a written order finding that "[t]he totality of the evidence shows clearly and convincingly that at different points, [attorney Uche] talked to both brothers and their mother" and that the topics discussed included immunity, the $3500 check, the search warrant, items seized during execution of the search warrant, the laws about hate crimes, and handling of the intense media demands. The court stated that it "firmly believe[d] that the interest of Mr. Smollett to have the lawyer of his choice when his liberty is at stake outweigh[ed] any other valid and good faith concerns of the OSP and the Osundairo family witnesses" and it "also believe[d] that it ha[d] a firm obligation to protect the integrity of the trial and the legitimate concerns of the Osundairo family witnesses." Although the court did not disqualify attorney Uche from representing Smollett, the court held that attorney Uche would not be allowed to cross-examine the Osundairo family members at trial. The court explained that "[attorney Uche] may appear as Counsel for Mr. Smollett with the following limitations *** Some other member(s) of the highly qualified defense attorneys shall cross examine the Osundairo family witnesses should this matter be ultimately adjudicated by way of trial."

¶ 55    "[T]here is a presumption in favor of defendant's counsel of choice." *People v. Buckhanan*, 2017 IL App (1st) 131097, ¶ 26. There is a two-part test that governs challenges to a defendant's counsel of choice. *Id.* ¶ 27. The court must first determine if there is a conflict or serious potential for conflict. *People v. Ortega*, 209 Ill. 2d 354, 361, 365 (2004). If the court finds a conflict, it then must "consider the interests threatened by the conflict or potential conflict." *Id.* at 361. To determine whether the interests threatened by the conflict or potential conflict are weighty enough to overcome the presumption, the court may consider and weigh four factors, including

> "(1) the defendant's interest in having the undivided loyalty of counsel; (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential

information to attack a State's witness; (3) the appearance of impropriety should the jury learn of the conflict; (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction." *Id.* at 361-62.

¶ 56 This is not an exhaustive list, as "[a] court should seek to fairly consider all the interests that are affected by a conflict in a given case." *Id.* at 362. Further, "where appropriate, the court should consider whether there are alternatives to disqualification that would remove the conflict while still protecting defendant's right to counsel." *Buckhanan*, 2017 IL App (1st) 131097, ¶ 27. "We review the trial court's decision to disqualify counsel for an abuse of discretion ***." *Id.* "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. King*, 2020 IL 123926, ¶ 35.

¶ 57 Based on the evidence introduced at the hearing, the court reasonably concluded that "in light of the topics discussed and the circumstances in which they were discussed," the threshold criteria for an attorney-client relationship had been met. See Ill. R. Prof'l Conduct (2010) R. 1.18(a) (eff. Jan. 1, 2016) ("A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client."). Because the court reasonably concluded that the threshold criteria for an attorney-client relationship had been met, a serious potential for conflict existed. See *In re Marriage of Newton*, 2011 IL App (1st) 090683, ¶ 31 (" 'An attorney/client relationship can be created at the initial interview between the prospective client and the attorney, and it is possible that confidential information passed during the interview sufficient to disqualify the attorney from representing the opposing party in related litigation.' " (quoting *Nuccio v. Chicago Commodities, Inc.*, 257 Ill. App. 3d 437, 440 (1993), citing *Herbes v. Graham*, 180 Ill. App. 3d 692 (1989))); see also Ill. R. Prof'l Conduct (2010) R.

1.18(b) (eff. Jan. 1, 2016) ("Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client.").

¶ 58    The court ultimately concluded that the remedy of disqualification was available but decided to consider "other approaches *** to better achieve the interests of justice." The court decided that attorney Uche could continue to represent Smollett, but other members of the defense team would be required to cross-examine the Osundairo family members. Although attorney Uche was not allowed to cross-examine the Osundairo family witnesses, he was not prevented from being present during the cross-examinations, preparing questions for the cross-examinations, or from discussing their testimony or attacking their credibility during opening or closing arguments. The trial court's resolution fairly balanced the interests of the State's right to a fair trial and Smollett's right to the counsel of his choice. The court's ruling on the motion to disqualify was not fanciful, arbitrary, or unreasonable such that no reasonable person would agree with it. We find no abuse of discretion.

¶ 59                                  E. Rule 412 Discovery Violation

¶ 60    Before trial, Smollett filed a motion for discovery under Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). At the hearing on the motion, Smollett requested that the OSP disclose notes made during an October 5, 2019, meeting with the Osundairo brothers. He argued that the Osundairo brothers "met for hours with representatives" of the OSP and the defense did not have "notes as to what was discussed and their statements at that time which is highly relevant." In response, the OSP argued that it did not generate any reports from the meeting and only had attorney notes consisting of "internal opinions, theories, conclusions of the State, purely work product as opposed to formal memoranda that either the investigator put together or our office and

all of those have been tendered." The court denied Smollett's motion to compel discovery of the OSP notes, finding that the notes were the attorneys' work product.

¶ 61 The defense requested the court to conduct an *in camera* inspection of the OSP notes from the October 5, 2019, meeting with the Osundairo brothers, which the court also denied.

¶ 62 Under Rule 412(a)(i), upon written motion of defense counsel, the State must disclose to defense counsel the following material and information within its possession and control:

> "(i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court *in camera* and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel[.]" Ill. S. Ct. R. 412(a)(i) (eff. Mar. 1, 2001).

"[T]he purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63 (1999). "Although compliance with the discovery rules is mandatory, the failure to comply with these rules does not require reversal absent a showing of prejudice." *Id.* It is the defendant's burden to show surprise or prejudice. *People v. Taylor*, 409 Ill. App. 3d 881, 908 (2011).

¶ 63 At the hearing on the first motion to compel discovery of the OSP's notes, the OSP informed the court that the notes from the meeting were attorney notes and "clearly work product," noting that they were "internal opinions, theories, conclusions of the State." The court, without examining the notes *in camera*, denied the motion based on the notes being protected work

product. Although the State is not required to disclose privileged work product (*People v. Szabo*, 94 Ill. 2d 327, 344 (1983)), the court, not the prosecutor, must make the determination regarding whether memoranda summarizing a witness's oral statements contains privileged material. See *People v. Young*, 128 Ill. 2d 1, 41 (1989) (concluding that the trial court erred when it relied on the assistant state's attorney's "representations that the notes did not contain verbatim statements," noting that the "determination whether memoranda contain verbatim or substantially verbatim reports summarizing a witness' oral statements is to be made by the court, not the prosecutor"); see also *Szabo*, 94 Ill. 2d at 345 ("When the State resists disclosure, asserting that the statement or a portion thereof is irrelevant, or contains privileged material, or is not substantially verbatim, the court must examine the statement *in camera* and determine whether it is or is not properly producible; if necessary excise irrelevant or privileged matter; and turn over to the defendant whatever portion of the statement can fairly be said to be the witness' own words.").

¶ 64    In *Young*, the supreme court found that the trial court erred when it did not conduct an *in camera* review of the assistant state's attorney's notes from interviews with the State's witness, but found that the defendant was not prejudiced by the State's nondisclosure of the interview notes and that the error was harmless beyond a reasonable doubt. *Young*, 128 Ill. 2d at 44-45. The court concluded that the denial of an *in camera* inspection did not deprive the defendant the opportunity to effectively cross-examine the witness, thereby denying him the right of confrontation under the sixth and fourteenth amendments of the United States Constitution. *Id.* at 42. The court noted that the witness's testimony "was not the only evidence tending to establish" the defendant's guilt and "the denial of the opportunity to use the interview notes in cross-examining [the witness] [did not] affect[ ] the reliability of the fact-finding process at trial." *Id.* at 44-45.

¶ 65    In the instant case, although the trial court erred in denying Smollett's motion to compel discovery of the OSP notes from the October 5, 2019, meeting with the Osundairo brothers without conducting an *in camera* review of the notes, the error was harmless beyond a reasonable doubt. See *id.* at 41-44. In addition to testimony and police reports, there was substantial evidence that corroborated the Osundairo brothers' testimony and tended to establish Smollett's guilt, including video evidence, cell phone GPS data, and text messages. Therefore, "we cannot say that there is a reasonable doubt that the defendant would not have been convicted if the [trial] court had conducted an *in camera* inspection of the [interview] notes." *Id.* at 45. Under these circumstances, "[a]ny error in this regard was thus harmless beyond a reasonable doubt." *Id.*

¶ 66    In *Szabo*, upon which Smollett relies, the testimony at issue was the "only evidence tending to establish that [the defendant] premeditated" the murders. See *id.* at 44-45 (distinguishing *Szabo*, noting that the alleged accomplice in *Szabo* was the only occurrence witness and the accomplice's testimony "concerning Szabo's lead role in planning and carrying out the crimes was the only evidence tending to establish that Szabo premediated the murders"). In the present case, as discussed herein, the Osundairo brothers' testimony was corroborated by substantial evidence that established that Smollett was guilty of disorderly conduct for falsely reporting to the police that he was the victim of a violent attack. We find that Smollett has failed to establish that he was prejudiced by the OSP's nondisclosure of the notes.

¶ 67                                    F. Public Access to Trial

¶ 68    Defendant next contends that the trial court violated his constitutional right to a public trial by the imposition of COVID-19 restrictions during jury selection. In October 2021, a month before Smollett's scheduled trial date, the trial court e-mailed the parties informing them that, while criminal courts in Cook County were still operating, they were operating with 50% capacity limits.

This meant that only 57 people would be allowed in the courtroom during Smollett's trial. The court informed the media that all of the seats in the courtroom were being reserved for prospective jurors. However, the court agreed to "keep the doors open on both sides" of the courtroom for the media "to listen and observe."

¶ 69    Under the sixth amendment of the United States Constitution, a criminal defendant is guaranteed the right to a public trial. U.S. Const., amend. VI; *People v. Radford*, 2020 IL 123975, ¶ 25. The Illinois Constitution guarantees the same. Ill. Const. 1970, art. I, § 8. This protection requires the trial court to take all reasonable measures to ensure public attendance at a criminal trial. *Radford*, 2020 IL 123975, ¶ 25. The right to a public trial protects both the defendant and the public. *Id.* For the defendant, a public trial allows the public to observe that he is fairly adjudicated, ensures the trier of fact recognizes the importance of the matter, ensures that the trial judge and the prosecutor responsibly carry out their duties, encourages witnesses to testify, and discourages witnesses from lying. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). For the community at large, a public trial "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508 (1984). The right to a public trial extends beyond the trial itself to include jury selection. *Radford*, 2020 IL 123975, ¶ 25.

¶ 70    We initially note that Smollett failed to contemporaneously object to the trial court's decision to reserve the seats inside the courtroom for prospective jurors only. Based on Smollett's failure to object, he has failed to preserve this claim of error for review. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). When a defendant forfeits a claim of error, we will only consider if the error was a plain error. *Id.* The plain-error doctrine "bypasses normal

forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *Id.* at 613. The doctrine applies when a clear or obvious error has occurred and either (1) "the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error [was] so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48. The first step in a plain-error analysis is to determine if a clear or obvious error occurred. *People v. Jackson*, 2022 IL 127256, ¶ 21.

¶ 71    "[C]ourtroom closure is to be avoided, but *** there are some circumstances when it is justified." *Weaver v. Massachusetts*, 582 U.S. 286, 297 (2017). When Smollett's trial began, COVID-19 restrictions in effect resulted in only 57 people being allowed in the courtroom. Allowing 50 prospective jurors, court staff, and the parties' attorneys strained this capacity limit and raised obvious public health concerns. Under this backdrop, the court properly determined that allowing members of the media, and implicitly other members of the public, to be present in the courtroom was problematic. The court's decision to keep the doors of the courtroom open during jury selection allowed people in the hallway, including members of the public and the media, to observe the proceedings inside the courtroom. This accommodation reasonably balanced the public's right to observe jury selection and Smollett's right to a public trial with the logistical needs of conducting a trial under COVID-19 restrictions. Consequently, Smollett cannot demonstrate that the trial court clearly or obviously erred, and therefore, he has not established plain error. See *People v. Bannister*, 232 Ill. 2d 52, 79 (2008) (asserting that, absent "error, there can be no plain error"). Accordingly, Smollett's constitutional right to receive a public trial was not violated by the COVID-19 restrictions imposed by the court.

¶ 72    Smollett also posits that the trial court improperly excluded a civilian referred to as Bella BAHHS from the courtroom during his trial. Even assuming *arguendo* that one individual was excluded from Smollett's trial, his constitutional right to a public trial was not violated, as it proceeded in front of his family and friends as well as members of the media, who "served as the eyes and ears of the public." *Radford*, 2020 IL 123975, ¶ 41; see *People v. Falaster*, 173 Ill. 2d 220, 228 (1996) (where the trial court removed several spectators who "were not members of the defendant's immediate family and thus did not have a direct interest in the outcome of the case" from the courtroom while a 14-year-old sexual assault victim testified, "none of the evils of closed trials [were] implicated" because the trial court "did not impose any restrictions on the media, which were still allowed full and uninhibited access to the proceedings").

¶ 73                               G. Rule 431 and *Voir Dire*

¶ 74    Smollett next contends that the trial court violated Illinois Supreme Court Rule 431 (eff. July 1, 2012) by not allowing defense counsel to directly question prospective jurors during *voir dire*. Prior to trial, the court stated that it had a "normal way of picking" jurors and would "do all of the talking during *voir dire*." However, the court also stated that it would "invite input from the lawyers" on specific questions to ask, emphasizing that the degree of "pretrial publicity" warranted such consideration. In response, Smollett submitted more than 50 questions on topics such as the potential juror's consumption of media, his or her awareness of Smollett as well as questions about race, sexual orientation, hate crimes, the false reporting of crimes, and COVID-19. The record reflects that the majority of Smollett's proposed questions were incorporated into the court's *voir dire* questioning.

¶ 75    The defendant has a constitutional right to a trial before an impartial jury, and *voir dire* is a procedure that helps protect that right. *People v. Encalado*, 2018 IL 122059, ¶ 24. The primary

purpose of *voir dire* is to ensure the selection of a fair and impartial jury. *Id.* Questioning potential jurors is designed to identify whether any potential jurors have a bias or harbor an opinion that would affect their fair determination of the issues presented at trial. *Id.* The trial court "is primarily responsible for initiating and conducting *voir dire.*" *People v. Rinehart*, 2012 IL 111719, ¶ 16. To this end, the court controls "[t]he manner, extent, and scope of *voir dire* examination." *Encalado*, 2018 IL 122059, ¶ 25.

¶ 76 Admittedly, the trial court must "permit the parties to supplement its examination 'by such direct inquiry as the court deems proper,' " under Illinois Supreme Court Rule 431 (eff. July 1, 2012). *Rinehart*, 2012 IL 111719, ¶ 16 (quoting Ill. S. Ct. R. 431 (eff. May 1, 2007)). Although Illinois Supreme Court Rule 431(a) (eff. July 1, 2012) uses the word "shall," the court is not required to permit the parties to supplement its examination by their own direct inquiry of the potential jurors. *People v. Garstecki*, 234 Ill. 2d 430, 442-44 (2009). Rather, the court must consider the factors listed in Rule 431(a)—the length of the court's examination of potential jurors, the complexity of the case, and the type of charges the defendant is facing—"and then determine, based on those factors, whatever direct questioning by the attorneys would be appropriate." *Id.* at 444. While the court maintains discretion in determining whether to allow the parties to supplement its examination by direct inquiry, its "discretion is guided by a preference for permitting direct inquiry of prospective jurors by the attorneys if such an opportunity is sought." *People v. Adkins*, 239 Ill. 2d 1, 18 (2010). Trial courts may not "simply dispense with attorney questioning whenever they want." *Garstecki*, 234 Ill. 2d at 444. Although rare, there are circumstances where it is appropriate for the court to reject a party's request to have his attorney directly question potential jurors. *Id.*

¶ 77    In balancing a party's right to supplement the trial court's examination with its own direct inquiry, the court must also ensure that *voir dire* questioning does not act as "a means of indoctrinating a jury, or impaneling a jury with a particular predisposition." *People v. Bowel*, 111 Ill. 2d 58, 64 (1986). To this end, "[s]pecific questions tailored to the facts of the case and intended to serve as 'preliminary final argument' " are usually not allowed. *Rinehart*, 2012 IL 111719, ¶ 17 (quoting *People v. Mapp*, 283 Ill. App. 3d 979, 989-90 (1996)). We review the court's conduct during *voir dire* for an abuse of discretion. *Id.* ¶ 16. This only "occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *Id.* A trial court does not abuse its discretion during *voir dire* if the procedure employed "create[d] 'a reasonable assurance that any prejudice or bias would be discovered.' " *Id.* (quoting *People v. Dow*, 240 Ill. App. 3d 392, 397 (1992)).

¶ 78    In *People v. Gonzalez*, 2011 IL App (2d) 100380, ¶¶ 4-6, the trial court did not allow any of the parties' attorneys to question potential jurors and prevented the attorneys from asking any follow-up questions. On appeal, this court observed that "nothing in the record indicates that the court considered the factors in Rule 431(a) before denying the attorneys the opportunity to question the venire directly." *Id.* ¶ 24. We noted that, "before *voir dire* ever began, the court determined that it would not allow any direct questioning, and later it simply stated that there would be no direct supplemental questioning because this was a 'new regime.' " *Id.* Because the court "decided that it would dispense with all direct attorney questioning without consideration of Rule 431(a)," the court failed to comply with the rule. *Id.*

¶ 79    In the instant case, unlike in *Gonzalez*, the trial court openly invited input from the parties throughout *voir dire*. The court recognized that, while the case generated significant pretrial publicity, the disorderly conduct charges were not complex. See Ill. S. Ct. R. 431(a) (eff. July 1,

2012) (providing that the trial court must consider "the complexity of the case" as well as "the nature of the charges"). And while the court never explicitly discussed "the length of examination by the court" (see *id.*), such consideration was implicit based on the court's invitation to the parties to submit questions they wanted the court to ask prospective jurors and its understanding that Smollett wanted several of his own questions asked. Moreover, the court's acknowledgment of the significant pretrial publicity in the case implied that its examination of potential jurors would be more extensive than normal. In addition, the record confirms that the trial court conducted a lengthy and comprehensive *voir dire*, which incorporated many of Smollett's proposed questions.

¶ 80    Still, Smollett argues that the trial court relied on a factor not listed in Rule 431(a), that defense counsel might attempt to influence the jurors with his questions. While Rule 431(a) lists only three factors the court must consider, the court's contemplation of the effect of defense counsel's questioning on potential jurors was not unreasonable because the court has a responsibility to ensure that *voir dire* does not act as "a means of indoctrinating a jury, or impaneling a jury with a particular predisposition." *Bowel*, 111 Ill. 2d at 64.

¶ 81    The trial court's *voir dire* demonstrated a steadfast effort to ferret out any potential jurors who harbored biases or prejudices against Smollett. The court questioned the jurors about their media consumption and their membership in any clubs or organizations involving police issues, civil rights, and LGBTQ rights, and it asked whether they watched the television show *Empire*, the television show Smollett was on. Additionally, the court asked potential jurors if they had performed any research about the case previously and asked follow-up questions where necessary to ensure jury impartiality. For example, when one potential juror said she had researched the case, the court asked about the nature of her research. The potential juror responded that her daughter worked near the location of the alleged crime, causing the potential juror to perform research

because she "was very concerned." When pressed regarding whether she could put aside any feelings she had toward either party due to her research and her daughter, she wavered and ultimately said she was unsure. In a later discussion with the parties, the court *sua sponte* suggested striking this juror for cause, and by agreement of the parties, she was discharged. The court's procedures and questions created a reasonable assurance that any prejudice or bias of a potential juror would be discovered. See *People v. Applewhite*, 2016 IL App (4th) 140558, ¶¶ 81-82 (in an aggravated criminal sexual abuse case, where during *voir dire* the trial court barred defense counsel from individually questioning potential jurors about their own personal sexual abuse issues and instead determined that it would be the sole inquirer, the appellate court found the procedure was conducted with the primary purpose "to exclude prospective jurors who are unwilling or unable to be impartial arbiters" and therefore implemented in accordance with Rule 431(a)). Although the court did not ask every *voir dire* question proposed by Smollett, the court is not required to do so. See *In re Commitment of Edwards*, 2021 IL App (1st) 200192, ¶¶ 45, 55. Viewing the record in its entirety, the trial court complied with the requirements of Rule 431(a) and did not abuse its discretion by performing all of the questioning during *voir dire*.

¶ 82                                    H. *Batson* Motions

¶ 83     Smollett next contends that the trial court erred in denying his motions alleging that the OSP used its peremptory challenges in a discriminatory manner during jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, Smollett challenges the exclusion of four African-American prospective jurors and one prospective juror who, Smollett's defense believed, identified as gay.

¶ 84     The equal protection clause of the fourteenth amendment of the United States Constitution prohibits the State from using race in exercising a peremptory challenge during jury selection. U.S.

Const., amend. XIV; *Batson*, 476 U.S. at 84, 89. As enunciated in *Batson*, there is a three-step process for determining whether the State improperly exercised a peremptory challenge on the basis of race. *People v. Davis*, 231 Ill. 2d 349, 360 (2008) (citing *Batson*, 476 U.S. at 96). First, the defendant must establish a *prima facie* showing that the State exercised a peremptory challenge on the basis of race. *Id.* Second, if the defendant makes a *prima facie* showing, the State must present a race-neutral reason for striking the juror in question, which the defendant can rebut as pretextual. *Id.* at 362-63. Third, the trial court is required to determine whether the defendant has demonstrated intentional discrimination. *Id.* at 363.

¶ 85   In the instant case, although the trial court invited the OSP to proffer race-neutral reasons for exercising its peremptory challenges, the court never found that Smollett made a *prima facie* showing that the OSP exercised a peremptory challenge on the basis of race. At the first stage, the defendant's burden is not great, and he can make the *prima facie* showing by merely presenting "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005); see *Davis*, 231 Ill. 2d at 360. There are several relevant factors the court may consider when determining if the defendant has made a *prima facie* showing:

> "(1) the racial identity between the party exercising the peremptory challenge and the excluded venirepersons; (2) a pattern of strikes against African-Americans on the venire; (3) a disproportionate use of peremptory challenges against African-Americans; (4) the level of African-American representation in the venire compared to the jury; (5) the prosecutor's questions and statements of the challenging party during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a

heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim and witnesses." *Davis*, 231 Ill. 2d at 362.

¶ 86     In determining whether the defendant made a *prima facie* showing, the trial "court must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike to see if they give rise to a discriminatory purpose." *Id.* at 360 (quoting *Batson*, 476 U.S. at 93-94, 96-97). At the first stage of a *Batson* analysis, we will not overturn the court's conclusion unless it was against the manifest weight of the evidence (*People v. Williams*, 173 Ill. 2d 48, 71 (1996)), which occurs when the opposite conclusion is plainly evident or where the finding itself was arbitrary, unreasonable, or not based upon the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). "Ordinarily, the party asserting a *Batson* claim has the burden of proving a *prima facie* case and preserving the record, and any ambiguities in the record will be construed against that party." *Davis*, 231 Ill. 2d at 365. The exception to this general rule occurs when the trial court *sua sponte* raises a *Batson* claim (*id.*), which is not the case here.

¶ 87     At the outset, as discussed, when the trial court entertained Smollett's *Batson* motions, it directed the OSP to proffer race-neutral reasons for exercising its peremptory challenges on prospective jurors Derline R., Bevely D., Mildred B., and Sandra W., even though it never found that Smollett made a *prima facie* showing. Although the court, in its own words, was "being cautious" and apparently attempting to present a more comprehensive record by allowing the OSP to proffer race-neutral reasons, its procedure had the effect of collapsing the first and second stages of a *Batson* analysis, which our supreme court has warned against. See *People v. Rivera*, 221 Ill. 2d 481, 500-01 (2006); *People v. Wiley*, 156 Ill. 2d 464, 475 (1993). Despite this, the court's ultimate conclusions that Smollett failed to establish a *prima facie* showing were not against the manifest weight of the evidence.

¶ 88    Smollett's *Batson* motions concerning Derline R., Bevely D., Mildred B., and Sandra W. failed to establish a *prima facie* showing of discrimination because he provided no argument other than noting they were all African-American. While the race of the excluded venirepersons as compared to the defendant is certainly a relevant factor in determining whether a defendant has made a *prima facie* case, it is but one of several factors. See *Davis*, 231 Ill. 2d at 362. In order to make a *prima facie* showing, it was incumbent upon Smollett to present "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. Although the burden is not great, there is still a burden. See *id.* Merely raising a *Batson* motion based on the OSP exercising a peremptory challenge on a prospective juror who is African-American without any additional argument is insufficient to carry that initial burden. "[A]s a general rule, the mere number of [African-American] venire members peremptorily challenged, without more, will not establish a *prima facie* case of discrimination." *People v. Garrett*, 139 Ill. 2d 189, 203 (1990).

¶ 89    For instance, in *Heard*, 187 Ill. 2d at 52, a defendant contended that the State violated *Batson* when it exercised five peremptory challenges on African-American venirepersons. The defendant's argument in favor of a *Batson* violation "rest[ed] solely on the basis that the prosecution used peremptory challenges to exclude five [African-American] venirepersons." *Id.* at 56. After observing the well-established principle that a defendant cannot make a *prima facie* showing by simply pointing to the number of African-American venirepersons peremptorily challenged, our supreme court asserted that, "[b]ecause [the] defendant has not provided any other information to support his claim of discriminatory jury selection, he has failed to establish a *prima facie* case of discrimination in the jury selection." *Id.* Smollett's argument to the trial court was the same and thus was insufficient to establish a *prima facie* showing. See *People v. Allen*,

401 Ill. App. 3d 840, 848-49 (2010) (finding the defendant failed to make a *prima facie* showing of racial discrimination because his *Batson* motion only alleged that the State exercised peremptory challenges of African-American men from the jury, as the motion was "bare-bones," "did not contain any specific facts to support the allegation of discrimination," and thus failed to "produce evidence sufficient to permit the trial court to draw an inference that discrimination had occurred").

¶ 90     Nevertheless, Smollett posits that the trial court erred in analyzing his *Batson* motions by failing to consider the relevant factors listed in *Davis*, which he now argues are in his favor, to determine whether he made a *prima facie* showing. By making this argument, Smollett attempts to shift the burden to make the *prima facie* showing from himself to the court. It was his burden to present evidence and argument based on the various factors when bringing his *Batson* motions before the court, and he cannot satisfy that burden by making those arguments now, for the first time, on appeal. See *People v. Sanders*, 2015 IL App (4th) 130881, ¶¶ 33-34 (rejecting a defendant's claim that the trial court should have guided the parties through the *Batson* analysis and asked questions based upon the various factors because the defendant "had the burden of establishing a *prima facie* case of purposeful discrimination before the trial court—not on appeal").

¶ 91     At no point did the trial court deny him an opportunity to expand on his *Batson* motions and make an argument on the record based on the relevant factors. Smollett simply raised his *Batson* motions and never attempted to develop a comprehensive argument supporting them. He cannot now claim that the court failed to consider factors he never argued in the first instance. See *id.* ¶ 41 (finding the trial court did not err by failing to "*sua sponte* address other [*Davis*] factors, which [the defendant] claims were potentially in his favor" because "the trial court is not tasked with establishing defendant's *prima facie* case for him"). By not buttressing his *Batson* motions

with supporting argument based upon the relevant factors, Smollett failed to establish a *prima facie* showing of racial discrimination by the OSP when exercising its peremptory challenges.

¶ 92    Smollett further highlights that the impaneled jury contained only one African-American juror, a contention he also raised in his posttrial motion. However, during the actual jury selection, in particular when making his *Batson* motion concerning alternate juror Sandra W. after the 12-member jury had been selected, Smollett never stated for the record the composition of the impaneled jury. See *People v. Turner*, 110 Ill. App. 3d 519, 522 (1982) ("It is clear that the accused has the burden of properly preserving the trial proceedings [citation], and neither statements in [the] defendant's appellate brief [citation] nor assertions in a post-trial motion [citation] can substitute for a proper report of proceedings [citation]."). Equally as important, Smollett never made an argument to the trial court about the composition of the jury and the lack of African-American representation. To reiterate, Smollett had the burden to make a *prima facie* case to the trial court during jury selection, not to us on appeal. See *Sanders*, 2015 IL App (4th) 130881, ¶¶ 33-34, 41. Consequently, the court's conclusions that Smollett failed to make a *prima facie* showing of racial discrimination were not against the manifest weight of the evidence, and the court properly denied Smollett's *Batson* motions concerning Derline R., Bevely D., Mildred B., and Sandra W.

¶ 93    Lastly, Smollett argues that OSP acted unlawfully when exercising a peremptory challenge on prospective juror Saul A., whom Smollett's defense believed identified as gay. Section 2(b) of the Jury Act provides that, "[e]xcept as otherwise specifically provided by statute, no person who is qualified and able to serve as a juror may be excluded from jury service in any court of this State on the basis of *** sexual orientation." 705 ILCS 305/2(b) (West 2020). Section 2(b) of the Jury Act refers to the Illinois Human Rights Act (775 ILCS 5/1-101 (West 2020)) for the definition of

"sexual orientation" (705 ILCS 305/2(b) (West 2020)), which defines it as "actual or perceived heterosexuality, homosexuality, bisexuality, or gender-related identity, whether or not traditionally associated with the person's designated sex at birth." 775 ILCS 5/1-103(O-1) (West 2018). Our legislature added "sexual orientation" as a protected class under section 2(b) of the Jury Act through Public Act 101-327. See Pub. Act 101-327 (eff. Jan. 1, 2020) (amending 705 ILCS 305/2(b)). And it intended the amendment to codify *Batson* to protect sexual orientation. See 101st Ill. Gen. Assem., House Proceedings, May 22, 2019, at 16 (statements of Representatives Thapedi and Didech). Therefore, it is unlawful to exclude a potential juror on the basis of sexual orientation.

¶ 94 However, similar to Smollett's *Batson* claims concerning race, he failed to make a *prima facie* case of discrimination based on sexual orientation where all he did was highlight that Saul A. identified as gay yet failed to present any additional evidence to permit the court to draw an inference that discrimination occurred. See *Johnson*, 545 U.S. at 170. Consequently, the trial court's conclusion that Smollett failed to make a *prima facie* showing of sexual-orientation discrimination was not against the manifest weight of the evidence, and the court properly denied Smollett's *Batson* motion concerning Saul A.

¶ 95 I. Trial Court's Commentary During Cross-Examination

¶ 96 Smollett next contends that, during his cross-examination of Detective Michael Theis, the Chicago police's lead investigator of his case, and Ola Osundairo, the trial court made improper comments in the presence of the jury that violated his right to due process.

¶ 97 At trial, Detective Theis detailed the Chicago Police Department's investigation of Smollett's allegations. Although originally considered to be a crime victim, the subsequent investigation established that Smollett had staged a fake hate crime. Smollett's theory of defense

was that the police never took his allegations seriously and prematurely concluded that he had falsely reported a crime.

¶ 98 During cross-examination, Detective Theis testified that he could not recall whether he or his partner, Detective Michael Vogenthaler, ever asked Bola Osundairo whether the perpetrator "beat up [Smollett's] pretty face." When defense counsel played a video from Bola's interrogation for purposes of impeachment, the OSP objected based on relevance. In response, the trial court instructed defense counsel to: "Go ahead. Let's go. Let's go. Come on." Defense counsel proceeded to ask Detective Theis if Detective Vogenthaler's question was "appropriate." The court *sua sponte* sustained the OSP's prior objection and instructed defense counsel to ask another question. Defense counsel again asked about Detective Vogenthaler referring to Smollett's "pretty face," and the OSP again objected based on relevance. In denying the OSP's relevance objection, the court stated: "He can answer did [Detective Vogenthaler] say that. So what? Did [Detective Vogenthaler] say it?" Defense counsel replied: "I'm sorry. That's offensive. I'm sorry. I need a break. That's too much." After a short recess, the jury was admonished that trials were "contested matters" and occasionally professionals involved can "get testy." The jury was instructed not to "consider that one way or another, not the comments by lawyers, not the comments by the Court." The court added: "The rulings are the rulings, the evidence is the evidence, and I don't want you to concern yourself with the fact that some voices were raised and there was a little bit of consternation that was shown." According to Smollett, the court's remark "[s]o what?" improperly dismissed his attempt to establish homophobia as a central theory of the case.

¶ 99 Defense counsel also asked Detective Theis a series of questions based on the discovery of suspected narcotics during the execution of a search warrant on the Osundairo family residence. In sustaining the OSP's objection to one of these questions, the trial court asserted that "[e]very

situation is different for a variety of reasons." When defense counsel responded even "for cocaine and heroin?", the court stated: "You can try different questions. Don't assume every case and every police officer, that's not fair. Ask a different question." According to Smollett, the court's response to the OSP's objection had the effect of condoning Detective Theis's investigative decisions.

¶ 100   During another exchange with defense counsel, the trial court instructed counsel to continue his cross-examination "[w]ithout *** editorializing and trying to add—," and defense counsel interjected, "[e]xcuse me?" The court continued that defense counsel was "just trying to be a good lawyer, but the question is wrong, and he will answer the question why he had the gun fingerprinted. You asked him before and he can answer but don't add the other information." After further back and forth, defense counsel stated he was just trying to "mak[e] a record," and the court asked counsel not to argue, adding: "Just ask the question, please. I want to finish this witness. Please. Thank you."

¶ 101   During defense counsel's cross-examination of Ola, the trial court interjected that defense counsel was getting "a little far [a]field" and instructed her to "[f]ocus [her] cross[-examination]." Defense counsel subsequently asked for a sidebar, which the court denied, directing her to continue her cross-examination and noting she was asking about "very collateral matters." Ultimately, a sidebar was convened, and Smollett moved for a mistrial, which was denied. Before cross-examination resumed, the court again admonished the jury that "words come out like focus or collateral" during conversations with the parties' attorneys and instructed the jury to not consider any of those comments. Additionally, the court reminded the jury that its decision on Smollett's guilt must be based solely on the evidence and the law. According to Smollett, these comments were particularly prejudicial because the court used the word "collateral" and informed defense counsel that she was not focused. Finally, Smollett challenges the court's efforts to expedite cross-

examination. For example, in sustaining an objection, the court stated: "You've got to rephrase these things, please. That's hearsay. The jury will disregard that. Find another question, please. Move on." At another point, the court told defense counsel "[l]et's go" and "[c]ome on" during various parts of cross-examination.

¶ 102    "Every defendant, regardless of the nature of the proof against him or her, is entitled to a trial that is free from improper and prejudicial comments on the part of the trial judge." *People v. Heidorn*, 114 Ill. App. 3d 933, 936 (1983). While the court has broad discretion in presiding over a trial, it must refrain from commenting on, or insinuating, its opinion of the case in front of the jury. *Id.* "A hostile attitude toward defense counsel, an inference that defense counsel's presentation is unimportant, or a suggestion that defense counsel is attempting to present a case in an improper manner may be prejudicial and erroneous." *People v. Harris*, 123 Ill. 2d 113, 137 (1988). This is of critical importance during a jury trial because the court's influence over the jury is great. *Heidorn*, 114 Ill. App. 3d at 937. However, such comments are not reversible error unless they "constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." *Harris*, 123 Ill. 2d at 137.

¶ 103    Even assuming *arguendo* the trial court's remarks were improper, the extensive curative instructions given to the jury obviated any potential prejudice from these comments. See *id.* at 139 (concluding that the trial court's allegedly improper comments during trial were not prejudicial to the defendant where "the jury was instructed that the court's rulings and remarks were not meant to indicate any opinion either on the facts or on what the verdict should be"). Additionally, "a trial judge retains wide latitude to impose reasonable limits on such cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *People v. Kliner*, 185 Ill. 2d 81, 134 (1998). Telling defense

counsel to focus and move away from collateral issues during the cross-examination of Ola served to inform defense counsel that she was wading into areas of minimal relevance for the issues at trial and to continue her cross-examination on more relevant issues. See *id.*; see also *Harris*, 123 Ill. 2d at 138-39 (finding the trial court's comments "amounted to no more than an attempt to move the already lengthy cross-examination along," which "during the course of vigorously defended protracted criminal litigation are common and oftentimes necessary"). Although the record suggests that the court may have become impatient with defense counsel at various points during cross-examination, the "showing of impatience, in itself, does not evidence bias against defendant or his case." *People v. Moore*, 2023 IL App (1st) 211421, ¶ 126.

¶ 104   As to Smollett's argument that the trial court improperly defended Detective Theis's investigative decisions and baselessly accused defense counsel of editorializing during recross-examination of Detective Theis, the record shows that these were isolated comments made in the course of a nearly two-week trial, during which Smollett was allowed to extensively cross-examine the witnesses. As such, the comments did not constitute a material factor in Smollett's conviction. See *Harris*, 123 Ill. 2d at 137.

¶ 105                          J. IPI Criminal No. 3.17

¶ 106   Smollett's next contention on appeal is that the trial court abused its discretion when it failed to give Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.17) on accomplice testimony. An accomplice instruction applies when a witness is an accomplice and testifies for the prosecution, implicating the defendant. *People v. Ticey*, 2021 IL App (1st) 181002, ¶ 63 (citing *People v. Buffington*, 51 Ill. App. 3d 899, 901-02 (1977) (strong motivation for accomplice to testify falsely because of expectation of lenient treatment by the State in return for favorable testimony)). IPI Criminal No. 3.17 states: "When a

witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution." "The test for determining whether a witness is an accomplice for the purposes of the accomplice witness instruction is whether the witness could have been indicted for the offense in question either as a principal or under a theory of accountability." *People v. Lewis*, 240 Ill. App. 3d 463, 466-67 (1992). Generally, the trial court has discretion to determine jury instructions. See *Ticey*, 2021 IL App (1st) 181002, ¶ 62.

¶ 107    Here, Smollett was charged with knowingly reporting to a police officer that he had been a victim of a hate crime, battery, and aggravated battery and that he knew at the time of the reporting that there were no reasonable grounds for believing such offenses had been committed. Accordingly, the test for whether to give an accomplice jury instruction in this case was whether the Osundairo brothers could have been indicted for knowingly transmitting to police that a hate crime, battery, and aggravated battery had been committed knowing that there were no reasonable grounds for believing those offenses had been committed. While the Osundairo brothers readily admitted to planning and carrying out the fake attack on Smollett, there was no evidence introduced at trial that they were involved in making false reports to the police.

¶ 108    Significantly, "one is not an accomplice merely because he ' "has guilty knowledge *** or who was even an admitted participant in a related but distinct offense." ' " *People v. Strickland*, 2019 IL App (1st) 161098, ¶ 51 (quoting *People v. Robinson*, 59 Ill. 2d 184, 191 (1974), quoting *People v. Hrdlicka*, 344 Ill. 211, 222 (1931)). Both Osundairo brothers testified at trial that they would not have gone along with the hoax if they had known that Smollett was going to file a false police report. Based on the record before us, it cannot be said that the trial court's failure to give the jury an accomplice instruction was arbitrary, fanciful, or unreasonable to the degree that no

reasonable person would agree with it. See *King*, 2020 IL 123926, ¶ 35 (an abuse of discretion "occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it" (internal quotation marks omitted)).

¶ 109                                 K. Prosecutorial Misconduct

¶ 110   Smollett's next contention on appeal is that his rights to a fair trial and due process were violated when the OSP committed several acts of prosecutorial misconduct.

¶ 111                                 1. Witness Pressure

¶ 112   Defense witness Anthony Moore testified that he saw a white male leaving the scene on the night of the crime. Moore also testified that on January 9, 2020, he told the special prosecutor that he saw a white male on the night in question. The OSP typed up a statement for him to sign, which he read and initialed. Defense counsel then elicited that Moore "felt pressured and threatened to say something that [he] didn't see." When defense counsel asked whether Moore saw "the person in court who pressured and threatened him" and asked Moore to point that person out, Moore pointed to special prosecutor Sean Wieber. At this point, the trial court called for a sidebar.

¶ 113   Defendant argues that the fair trial implications are "obvious" and states that Moore's credibility was "negatively impacted in front of the jury due to having inconsistent statements." Since the defense called Moore to the stand presumably knowing that he was going to testify inconsistently with his sworn statement because of pressure exerted upon him by Wieber, it is disingenuous for defendant to claim he was prejudiced by a situation he created.

¶ 114   Defense counsel then made an oral motion to disqualify the OSP based on Moore's testimony, which the court denied. Smollett contends, citing generally *People v. Rivera*, 2013 IL 112467, that the trial court should have granted the oral motion to disqualify "since the prosecutor

had essentially turned into a witness." Smollett does not explain how the OSP had turned into a witness or which portions of *Rivera* are relevant to the case at bar. We reiterate that "[a] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository into which the appealing party may dump the burden of argument and research." (Internal quotation marks omitted.) *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 205. The failure to cite authority or articulate an argument will result in forfeiture of that argument on appeal. *Id.* Forfeiture aside, we find Smollett's argument to be without merit.

¶ 115   In *Rivera*, 2013 IL 112467, ¶ 4, the defendant filed a written pretrial motion to suppress certain statements made to a police officer and an assistant state's attorney after he was in custody but before any charges had been filed against him. Prior to the suppression hearing, the State moved to disqualify the defendant's counsel, who was listed as a witness in the defendant's motion to suppress, arguing that defense counsel was prohibited from both representing the defendant and acting as a witness in the same proceeding. *Id.* The trial court granted the motion, finding that the written motion to suppress rendered the defendant's counsel a material witness. *Id.* On appeal, the defendant argued that the trial court's decision to disqualify his counsel violated his constitutional right to counsel of choice. *Id.* ¶ 33. Our supreme court found that, where counsel acted both as an advocate and a witness during pending litigation, defense counsel was required to withdraw from his representation of the defendant and the trial court did not abuse its discretion in disqualifying defense counsel. *Id.* ¶ 40.

¶ 116   Here, unlike in *Rivera*, defense counsel moved to disqualify the OSP after a witness he called accused the OSP of pressuring the witness prior to trial. The OSP was not called to testify and was not listed as a witness at trial. Disqualification is a drastic remedy, and courts must be vigilant in ensuring that motions to disqualify are not misused as tactical weapons for the purpose

of harassment or delay. *In re Estate of Wright*, 377 Ill. App. 3d 800, 804 (2007). We find that the trial court did not abuse its discretion in rejecting defense counsel's oral motion to disqualify the OSP. *People v. Downey*, 351 Ill. App. 3d 1008, 1011 (2004) (a trial court's decision on a motion to disqualify an attorney will not be disturbed absent an abuse of discretion).

¶ 117                                        2. Closing Argument

¶ 118   Smollett also contends the OSP improperly shifted the burden of proof from the OSP to Smollett during its rebuttal argument. The OSP maintains that the comment was made in response to defense counsel's closing argument. Prosecutors generally have a wide latitude in closing arguments and may comment on the evidence and any reasonable inferences arising from the evidence, even if the inferences reflect negatively on the defendant. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). We consider statements in the context of the closing arguments as a whole instead of examining the contested phrases in a vacuum. *Id.*

¶ 119   Defense counsel stated during closing argument, "There's a lot of missing data. You don't have the whole video. You don't know who they're talking to, and I'm going to get to that." In rebuttal, the OSP responded, "Next, they told you there was missing video. *** [Attorney Uche] gave you no evidence of any video that was missing."

¶ 120   It is well established that the State always has the burden of proving, beyond a reasonable doubt, the elements of the crime, and the State may not attempt to shift the burden of proof to the defendant. *People v. Robinson*, 391 Ill. App. 3d 822, 841 (2009). However, if defense counsel provokes a response in closing argument, the defendant cannot complain that the State's reply in rebuttal argument denied him a fair trial. *Id.*

¶ 121    Here, defense counsel argued in closing that there was "a lot of missing data" from the videos of the Osundairo brothers that were played for the jury. Accordingly, the disputed comment in the OSP's rebuttal argument that no evidence was presented to support this allegation of missing data is properly viewed as a response to defense counsel's argument. Moreover, a conviction will only be reversed where the prosecution's comments were so inflammatory or so flagrant that they denied the defendant a fair trial. *People v. Euell*, 2012 IL App (2d) 101130, ¶ 22. Here, the remark about evidence of the missing video was an isolated statement that did not create reversible error. See *People v. Runge*, 234 Ill. 2d 68, 142 (2009) (remarks have lesser impact on a jury when they are brief and isolated); *People v. Luna*, 2013 IL App (1st) 072253, ¶ 140 (where comments were brief and of little import in the context of State's lengthy closing argument, they did not amount to reversible error).

¶ 122                              3. Smollett's Postarrest Silence

¶ 123    Smollett's final prosecutorial misconduct argument is that the OSP impermissibly impeached Smollett with his postarrest silence in two instances, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). First, during direct examination of the OSP's witness, Detective Theis, the OSP asked if Smollett ever made statements saying the Osundairo brothers did nothing wrong. Defense counsel did not object to this line of questioning. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial ***."). The second instance was when the OSP asked Bola if Smollett "ever made a statement to the public where he admitted that the hate crime was a hoax." Smollett argues that this question implicated his postarrest silence by highlighting his failure to tell police officers the same story during the investigation, in violation of *Doyle*.

¶ 124   In *Doyle*, the Supreme Court held that it was a violation of the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) for the State to use a defendant's postarrest, post-*Miranda* silence for impeachment purposes. *Doyle*, 426 U.S. at 619. Illinois has expanded that rule by including pre-*Miranda* silence, finding that, "under Illinois evidentiary law, it is impermissible to impeach a defendant with his or her post-arrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings." *People v. Clark*, 335 Ill. App. 3d 758, 763 (2002).

¶ 125   At trial, a screenshot of a text message sent by Smollett to Bola on February 14, 2019, before Smollett's arrest, was entered into evidence. It stated in part: "I know 1000% you and your brother did nothing wrong and never would. I am making a statement so everyone else knows." When the OSP asked if Smollett ever made "any statement to the public where he admitted that the hate crime was a hoax," the trial court sustained defense counsel's objection and instructed the jury to "[d]isregard the question and answer." A trial judge's prompt action in sustaining an objection will be sufficient to cure any error in a question or answer before the jury. *People v. Redd*, 173 Ill. 2d 1, 29 (1996); see *People v. Edgecombe*, 317 Ill. App. 3d 615, 622 (2000). Here, the trial judge cured any prejudicial impact the comment may have had on the jury by sustaining defense counsel's objection and ordering the comment stricken. *Redd*, 173 Ill. 2d at 29; *People v. Speight*, 153 Ill. 2d 365, 376 (1992) ("[T]he trial judge's admonishment to the jury to disregard the prosecutor's improper statement cured the error.").

¶ 126                                L. *Good Morning America* Interview

¶ 127   Smollett's next contention is that the trial court abused its discretion in allowing the entirety of an interview he had with Robin Roberts on the television show *Good Morning America* (*GMA*) to go back to the jury during deliberation where the jury only saw a portion of the interview at trial

for impeachment purposes. The OSP responds that the *GMA* interview had been admitted into evidence and published to the jury as substantive evidence during the OSP's case-in-chief and therefore the court properly allowed the entirety of the interview into jury deliberations.

¶ 128   As an initial matter, we note that Smollett does not cite the pages in the record where the *GMA* interview was allegedly used for impeachment purposes. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that the appellant's brief include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Failure to include record citations when the argument requires an examination of the record results in forfeiture of the issue on appeal. *People v. Loera*, 250 Ill. App. 3d 31, 54 (1993). Forfeiture aside, we find that the court properly allowed the video of the *GMA* interview to be taken to the jury room. It is well established that whether evidentiary items "should be taken to the jury room rests within the discretion of the trial judge, whose decision will not be disturbed unless there was an abuse of discretion to the prejudice of the defendant." (Internal quotation marks omitted.) *People v. Hollahan*, 2020 IL 125091, ¶ 11.

¶ 129   In *People v. Montes*, 2013 IL App (2d) 111132, the defendant argued that the trial court should not have allowed an audio recording, which had been admitted as substantive evidence, to go back to the jury. *Id.* ¶ 68. The jury had only heard portions of the audio recording during the trial. *Id.* The appellate court acknowledged that "a recording may, in the court's discretion, be employed in the jury room." *Id.* It found that, where the trial court properly admitted the recording as substantive evidence and the jury heard portions of the recording at the trial, there was no abuse of discretion in permitting the entire recording to go to the jury room. *Id.*

¶ 130   Like *Montes*, the trial court here did not abuse his discretion in allowing the *GMA* interview, which had been properly admitted as substantive evidence, to be taken into the jury

room. See *id.* Smollett has not shown the court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the same view adopted by the court. See *King*, 2020 IL 123926, ¶ 35. Accordingly, we find that the trial court did not abuse its discretion in allowing the entire *GMA* interview to be taken into jury deliberations.

¶ 131                                    M. Sentence

¶ 132                              1. Excessive Sentence

¶ 133    Smollett next contends that the trial court abused its discretion in imposing excessive sentencing terms, given the nature of the offenses charged and the "overwhelming mitigation presented in the sentencing hearing."

¶ 134    Smollett was convicted of disorderly conduct (720 ILCS 5/26-1(a)(4) (West 2020)), a Class 4 felony. For a Class 4 felony, the trial court can sentence a defendant to a term of imprisonment that "shall be a determinate sentence of not less than one year and not more than 3 years." 730 ILCS 5/5-4.5-45(a) (West 2020). The court can also sentence a defendant to periodic imprisonment, which "shall be for a definite term of up to 18 months." *Id.* § 5-4.5-45(b). If the court sentences the defendant to probation, the period of probation "shall not exceed 30 months" (*id.* § 5-4.5-45(d)), and the court shall specify the conditions of probation as set forth in section 5-6-3. See *id.* §§ 5-4.5-45(d), 5-6-3. Section 5-6-3(e) states that "the court shall not require as a condition of the sentence of probation or conditional discharge that the offender be committed to a period of imprisonment in excess of 6 months." *Id.* § 5-6-3(e). Fines and restitution may also be imposed for a Class 4 felony. See *id.* § 5-4.5-45(e), (f).

¶ 135    Here, the trial court imposed a sentence of 30 months' probation, with the first 150 days to be served in the custody of the Cook County Jail, and a fine of $25,000. See *id.* § 5-4.5-50(b). The

sentence was within the statutory sentencing range and, thus, presumed to be proper. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36 ("[w]e presume that sentences within the statutory mandated guidelines are proper"). Nevertheless, Smollett argues that the condition of his probation requiring him to spend the first 150 days in jail was excessive because he was convicted of a nonviolent felony, he received a presentence report from the adult probation department that ranked him as low risk, he was not recidivist, there was a health risk in a custodial setting due to COVID-19, and a custodial setting posed a threat to Smollett due to his "unpopularity." He also posits that his 150-day jail condition was "unnecessary since the trial judge had imposed the maximum fine of $25,000."

¶ 136   Initially, we note that a fine does not render jail time unnecessary, as the statute specifically allows for both. See 730 ILCS 5/5-4.5-50(b) (West 2020) ("A fine may be imposed in addition to a sentence of *** probation, periodic imprisonment, or imprisonment."). Additionally, we presume the trial court considered all the mitigation evidence that was presented. See *People v. Burnette*, 325 Ill. App. 3d 792, 808 (2001). To rebut this presumption, a defendant must make an affirmative showing that the court did not consider the relevant factors. *People v. Canet*, 218 Ill. App. 3d 855, 864 (1991).

¶ 137   Aside from naming the mitigating factors he presumably thinks should have negated the probation condition of 150 days in jail, Smollett fails to make any affirmative showing that the trial court failed to give proper weight to mitigating evidence offered at his sentencing hearing. As noted above, a Class 4 felony is punishable by a term of imprisonment of one to three years or a term of periodic imprisonment of up to 18 months, neither of which the trial judge imposed here. See 730 ILCS 5/5-4.5-45(a), (b) (West 2020). Although the court had the authority to impose up to 6 months (180 days) in jail, Smollett was ordered to serve the first 150 days of his probation in

jail. See *id.* § 5-6-3(e). We find nothing in the record to indicate that the trial court abused its discretion in fashioning Smollett's sentence.

¶ 138                                    2. Restitution

¶ 139    Smollett also argues that the trial court erred in ordering restitution to be paid to the City of Chicago because Smollett's conviction of disorderly conduct "does not allow municipalities or public agencies to be viewed as victims under the restitution statute." The City of Chicago filed an *amicus curiae* brief on the issue. The OSP and the City both respond that Illinois law allows for a police department to be a "victim" under the applicable statute. We agree.

¶ 140    The restitution statute, which is contained in section 5-5-6 of the Unified Code of Corrections, authorizes courts to order restitution when a person has "received any injury to his or her person or damage to his or her real or personal property as a result of the criminal act of the defendant." *Id.* § 5-5-6. The statute provides: "[T]he court shall assess the actual out-of-pocket expenses, losses, damages, and injuries *** proximately caused by the same criminal conduct of the defendant." *Id.* § 5-5-6(b). A "victim" under the restitution statute is someone who has suffered property damage, personal injury, or financial loss. *People v. Danenberger*, 364 Ill. App. 3d 936, 943 (2006). When, as here, the issue is whether a restitution order is authorized by statute, it is a question of law that we review *de novo*. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 35.

¶ 141    While several cases in Illinois have held that a police department or government agency is not considered a "victim" within the meaning of the restitution statute,[1] "there is no *per se* rule

---

[1]Several cases in Illinois have held that a police department or government agency is not considered a "victim" within the meaning of the restitution statute. See, *e.g.*, *People v. Derengoski*, 247 Ill. App. 3d 751, 754 (1993); *People v. Lawrence*, 206 Ill. App. 3d 622 (1990); *People v. Chaney*, 188 Ill. App. 3d 334 (1989); *People v. Gayton*, 186 Ill. App. 3d 919 (1989); *People v. McGrath*, 182 Ill. App. 3d 389 (1989); *People v. Winchell*, 140 Ill. App. 3d 244 (1986); *People v. Evans*, 122 Ill. App. 3d 733 (1984).

prohibiting a law enforcement agency from receiving restitution." *People v. Ford*, 2016 IL App (3d) 130650, ¶ 29; *Danenberger*, 364 Ill. App. 3d at 944 ("we do not hold that a law enforcement agency can *never* be a victim entitled to restitution" (emphasis in original)). In *Danenberger*, 364 Ill. App. 3d at 941-42, the court vacated an order of restitution to the police department for investigation of a crime of disorderly conduct because the "defendant's offense did not proximately cause the department any out-of-pocket expenses, losses, damages, or injuries." Because the police department only sought restitution for the hours that officers and other employees spent on the job investigating the nonexistent crime, its losses were not compensable under the restitution statute. *Id.* at 942. The court stated, "[t]he money that the officers were paid for the hours that they spent investigating defendant's claim was money that they would have been paid anyway. There is no evidence that anyone who investigated defendant's report was paid anything beyond his or her normal compensation for working on defendant's case." (Emphasis omitted.) *Id.*

¶ 142   Here, the testimony at trial revealed that there were 24 to 26 detectives working on the investigation, totaling more than 3000 hours of work, and reviewing 1500 hours of video footage. At the sentencing hearing, a victim impact statement from the City of Chicago attested that the Chicago Police Department spent 1837 overtime hours investigating the false reports, costing the City $130,106. The OSP submitted an accounting of overtime expenses that the City incurred as a result of Smollett's false report. Unlike in *Danenberger*, the restitution in this case did not reimburse the City for its normal cost of investigating a crime but rather for its overtime expenses. Because the City suffered out-of-pocket expenses as a result of Smollett's conduct, it was entitled to restitution. *Id.*; *Ford*, 2016 IL App (3d) 130650, ¶ 30.

¶ 143   Having found that the City was entitled to restitution, we now turn to Smollett's argument that the trial court abused its discretion in ordering him to pay $120,106 to the City because the receipts justifying such restitution were "fraught with issues." A trial court's determination on restitution will not be reversed absent an abuse of discretion. *Ford*, 2016 IL App (3d) 130650, ¶ 26. When setting a restitution amount, a trial court "shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim." 730 ILCS 5/5-5-6(b) (West 2020). "The court must determine the actual costs incurred by the victim; a guess is not sufficient." *People v. Dickey*, 2011 IL App (3d) 100397, ¶ 25. "Alleged losses which are unsupported by the evidence must not be used as a basis for awarding restitution." *People v. Jones*, 206 Ill. App. 3d 477, 482 (1990).

¶ 144   Here, the record shows that the trial court properly assessed the out-of-pocket expenses incurred by the Chicago Police Department. The trial court heard the City's victim impact statement at the sentencing hearing, which attested that the Chicago Police Department had spent 1837 overtime hours investigating Smollett's false reports. This was not wholly unsupported by the evidence. To the contrary, the OSP submitted an accounting of overtime expenses that the City incurred as a result of Smollett's false report.

¶ 145   To the extent Smollett argues that there were descriptions lacking on some timecards, officers' names on the timecards were not all introduced at trial, some overtime expense reports were undated, and other discrepancies, we note that he never objected to such alleged discrepancies at the sentencing hearing or in his posttrial motion to reconsider his sentence, and thus he has forfeited this argument on appeal. See *People v. Marlow*, 303 Ill. App. 3d 568, 570 (1999) (a defendant who fails to object to an alleged error at sentencing or in a postsentencing motion forfeits any sentencing issues on appeal). While Smollett challenged the restitution order in his motion to

reconsider sentence, it was based on the argument that the Chicago Police Department could not be considered a "victim" within the meaning of the restitution statute, not on the amount or accounting, thus depriving the trial court of the opportunity to review these alleged accounting issues. See *People v. Greco*, 336 Ill. App. 3d 253, 260 (2003) (if defendant felt the restitution amount "was excessive, he should have objected," and the issue is forfeited on appeal).

¶ 146 We find *People v. Hanson*, 2014 IL App (4th) 130330, to be illustrative. There, the defendant failed to object to the amount of restitution at trial. *Id.* ¶ 40. The appellate court found that, given the specificity of the amount, "we doubt that the State just made up that amount without any basis for requesting it." *Id.* The court found that, where the only error complained of is the absence of some type of receipt or testimony in the record proving that the victim incurred the amount offered by the State, it is forfeited on appeal. *Id.* Likewise in the case at bar, where Smollett did not object at trial or in his motion to reconsider his sentence to the amount of overtime expenses incurred by the City, we find that he has forfeited such argument on appeal. Accordingly, the trial court did not abuse its discretion when it sentenced Smollett.

¶ 147                                III. CONCLUSION

¶ 148 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 149 Affirmed.

¶ 150 JUSTICE LYLE, dissenting:

¶ 151 "A prosecutor is duty bound [by the public] to exercise his best judgment both in deciding which suits to bring and in conducting them in court." *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976). At times, the exercise of that mandate is done through plea bargaining. "The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely

called 'plea bargaining,' is an essential component of the administration of justice." *Santobello v. New York*, 404 U.S. 257, 260 (1971). "Plea bargaining is an important and, perhaps, the central component of our criminal justice system." *People v. White*, 2011 IL 109616, ¶ 35 (Theis, J., specially concurring).

¶ 152   When handling a case, the State has many options. One set of options is a unilateral decision such as a unilateral *nolle prosequi*, dismissal, or deciding to not indict at all. Alternatively, the State can enter into bilateral agreements, such as plea agreements, nonprosecution agreements, deferred prosecutions, cooperation agreements, and immunity agreements. When the State makes a bilateral agreement as part of a prosecution, it is a "pledge of public faith—a promise made by state officials—and one that should not be lightly disregarded." *State v. Davis*, 188 So.2d 24, 27 (Fla. Dist. Ct. App. 1966). When immunity-type agreements, such as cooperation agreements, deferred prosecutions, or nonprosecution agreements, "are made by the public prosecutor, or with his authority, the court will see that due regard is paid to them, and that the public faith which has been pledged by him is duly kept. The prosecuting officer has also the power to enter a nolle prosequi [to effectuate that promise]." *Commonwealth v. St. John*, 54 N.E. 254, 254 (Mass. 1899).

¶ 153   The majority states that a *nolle prosequi* "is not a final disposition of the case, and will not bar another prosecution for the same offense." (Internal quotation marks omitted.) *People v. Milka*, 211 Ill. 2d 150, 172 (2004). While this is an accurate representation of the rights of the State in a unilateral *nolle*, the State can bargain away that right and others when making a bilateral agreement, such as a plea agreement, cooperative agreement, or a nonprosecution agreement. *State v. Kallberg*, 160 A.3d 1034, 1042 (Conn. 2017). In those circumstances, the State is typically making a concession to the defendant whether it is not prosecuting on the top charge, providing a

sentencing recommendation, or deciding to not prosecute at all, usually in exchange for the defendant to forgo his or her constitutional rights. *People v. Reed*, 2020 IL 124940, ¶ 25. In the context of a plea, defendants concede their right to a trial or, in the context of a cooperation agreement, self-incrimination. *Reed*, 2020 IL 124940, ¶¶ 25-26. When the State enters a *nolle* pursuant to a plea agreement, the State does so without the intention and ability to reinstate the charges, unless the plea falls apart. *Reed*, 2020 IL 124940, ¶ 25; see Ill. S. Ct. R. 605(c) (eff. Oct. 1, 2001); see also *Butler v. State*, 228 So.2d 421 (Fla. Dist. Ct. App. 1969) (where the prosecution agreed to nol-pros the charges if the defendant passed a polygraph with the understanding being that he would not be recharged); *People v. Reagan*, 235 N.W.2d 581 (Mich. 1975) (where the prosecution agreed to "dismiss" the charges against the defendant if he submitted to a polygraph and on the court date, the prosecutor entered an order of *nolle prosequi* on the charges pursuant to the agreement).

¶ 154 In *Reagan*, 235 N.W.2d at 582, the State entered into an agreement to dismiss the prosecution against the defendant if he passed a polygraph test. Pursuant to the agreement, the State sought a *nolle prosequi* order after the defendant passed the test. *Reagan*, 235 N.W.2d at 583. The State then reneged on the agreement and reinstituted the prosecution after discovering that the polygraph examination of the defendant may not have been reliable. *Reagan*, 235 N.W.2d at 583. The defendant was convicted and appealed his conviction. *Reagan*, 235 N.W.2d at 583. On appeal, the Michigan Supreme Court found that the State "gave a pledge of public faith which became binding when the *nolle prosequi* order was approved by the trial judge." *Reagan*, 235 N.W.2d at 583. The court found that "[n]ormally a *nolle prosequi* is a dismissal without prejudice which does not preclude initiation of a subsequent prosecution. [Citation.] Under the facts of this case,

however, entry of the order of *nolle prosequi* was by its presents [*sic*] the final act of fruition of a binding agreement." *Reagan*, 235 N.W.2d at 587.

¶ 155    Here, Smollett did not enter into a plea agreement with the State, but a bilateral agreement took place, which bound the State, nonetheless. The majority contends that there is no evidence in the State's agreement that the parties intended for the agreement to be tantamount to a dismissal with prejudice. I disagree.

¶ 156    As part of the appointment of the special prosecutor, the second directive of the OSP was to determine if any person within the Cook County State's Attorney's Office engaged in any wrongdoing. As part of the investigation, special prosecutors interviewed 53 people including the assistant state's attorney who entered the agreement on the record, the first assistant state's attorney of the Cook County State's Attorney's Office, and the chief deputy and chief ethics officer of the Cook County State's Attorney's Office, and they reviewed more than 26,000 documents. The OSP explained to the trial court that it drafted a 60-page report. In the redacted version of the report, it stated that the first assistant state's attorney spoke to the chief deputy and chief ethics officer and told her that the "terms of the dismissal" were similar to the requirements of the Deferred Prosecution Program (DPP). The report further asserted that, a day after the dismissal hearing, the assistant state's attorney who entered the *nolle* agreement on the record sent an e-mail to the assistant state's attorneys who led other branches or divisions in the Cook County State's Attorney's Office. According to the report, the assistant state's attorney stated:

> "We are looking for examples of cases, felony preferable, where we, in exercising
> our discretion, have entered into verbal agreements with defense attorneys to
> dismiss charges against an offender if certain conditions were met, such as the

payment of restitution, completion of community service, completion of class,
etc., but the defendant was not placed in a formal diversion program.

Please ask your [assistant state's attorneys] if they have examples of these types of
dispositions and we will work with them further to figure out on what case it was
done. Nobody is in trouble, we are just looking for further examples of how we, as
prosecutors, use our discretion in a way that restores the victim, but causes minimal
harm to the defendant in the long term."

¶ 157    On December 15, 2021, the OSP filed a motion to lift the seal on its August 17, 2020, summary report of its findings, as to the second directive, so that the report could be released to the public. On December 20, 2021, Judge Toomin lifted the seal on the report. In the report, the OSP stated:

"[T]he CCSAO dismissed the entire indictment against Mr. Smollett on the
following terms: (1) complete dismissal of the 16-count felony indictment against
Mr. Smollett; (2) no requirement that Mr. Smollett plead guilty to any criminal
offense under Illinois law; (3) no requirement that Mr. Smollett admit any guilt of
his wrongdoing (in fact, following the court proceedings on March 26, 2019, Mr.
Smollett publicly stated he was completely innocent); (4) the only punishment for
Mr. Smollett was to perform 15 hours of community service that had no relation to
the charged conduct; (5) only requiring Mr. Smollett to forfeit his $10,000 bond as
restitution to the City of Chicago (a figure amounting to less than 10% of the
$130,106.15 in police overtime pay that the City alleges it paid solely due to Mr.
Smollett's false statements to police); and (6) no requirement that Mr. Smollett

participate in the CCSAO's Deferred Prosecution Program (Branch 9) ("DPP"),

which would have required a one-year period of court oversight over Mr. Smollett.

The report further contended that the statement that the assistant state's attorney read during the

dismissal hearing was drafted in conjunction with Smollett's counsel.

¶ 158    Those reports, which are contained in the record, confirm that there was a verbal agreement

between the State and Smollett. From the collaboration in drafting the statement to the discussion

of specific terms of the agreement, the record shows that there was a verbal agreement reached by

the State and Smollett. That agreement required Smollett to complete 15 hours of community

service and forfeit his bond, in exchange for a *nolle* of the charges. Having acknowledged that

indeed there was an agreement and there being no argument that the State exceeded its authority

in negotiating and entering such an agreement, the dispute arises as to its impact. The majority's

position is that the State entering the *nolle* did not bar further prosecution, a position that is

unsupported legally and factually.

¶ 159    The OSP in its brief and at oral argument concedes that an agreement took place between

Smollett and the State wherein the State agreed to nol-pros the charges if Smollett performed

community service and forfeited his bond. At oral argument, the OSP stated that "if you actually

look at the record, Smollett bargained for and received a nolle pros." Both the OSP and the majority

contend that the bargain was for a *nolle* with Smollett understanding that the State could reinstate

charges at any time. The majority aptly notes that no Illinois court has ever applied principles of

contract law in interpreting the scope of a *nolle prosequi* disposition and whether a *nolle prosequi*

agreement bars further prosecution. However, it is well established that contract law applies in the

precharging phase, such as a nonprosecution agreement (*People v. Marion*, 2015 IL App (1st)

131011, ¶ 39) and a cooperation agreement (*People v. Smith*, 233 Ill. App. 3d 342, 347 (1992)),

and also the conviction and sentencing stage, when there is a plea agreement (*People v. Absher*, 242 Ill. 2d 77, 87 (2011)). Nothing in Illinois jurisprudence suggests that contract law would not apply in the circumstances of a deferred prosecution. Where there is no Illinois case law on the issue, however, we are "to look to other jurisdictions for persuasive authority." *Allstate Insurance Co. v. Lane*, 345 Ill. App. 3d 547, 552 (2003).

¶ 160    I find the analysis and explanation of *nolles* by the Connecticut Supreme Court in *Kallberg*, 160 A.3d at 1036-39, persuasive and believe that case is analogous to the case before us. In that case, the defendant and the State negotiated a global disposition in four separate cases, where the State agreed to nol-pros three cases in exchange for the defendant pleading guilty to possession of drug paraphernalia. *Kallberg*, 160 A.3d at 1036-39. On the day of the entry of the plea, the trial judge who was previously handling the case was not present, and the State renegotiated with the defendant to nol-pros all the counts if the defendant paid an amount to the victim's fund. *Kallberg*, 160 A.3d at 1036-39. The defendant paid the amount to the fund, and the State nol-prossed each of the four cases. *Kallberg*, 160 A.3d at 1036-39. However, the State subsequently charged and convicted the defendant, over his objection in the form of a motion to dismiss, of the larceny charges that were nol-prossed as part of the agreement. *Kallberg*, 160 A.3d at 1036-39. The Connecticut Supreme Court started its analysis with a discussion of unilateral versus bilateral *nolles*. *Kallberg*, 160 A.3d at 1041.

¶ 161    The Connecticut Supreme Court stated, when a prosecutor enters a unilateral *nolle*, it is a "unilateral act by a prosecutor, which ends the pending proceedings without an acquittal and without placing the defendant in jeopardy." (Internal quotation marks omitted.) *Kallberg*, 160 A.3d at 1041-42. The court then clarified that "[a] nolle may, however, be bargained for as part of a plea agreement; [citations]; or as part of an agreement whereby the defendant provides something else

of benefit to the state or the victim in exchange for entry of a nolle." *Kallberg*, 160 A.3d at 1042. In those circumstances, the *nolle* is equivalent to dismissal with prejudice of a nol-prossed charge. *Kallberg*, 160 A.3d at 1042. "Bilateral agreements in which the defendant provides a benefit to the state or the victim other than a guilty plea to a charge are typically treated as the functional equivalent to a plea agreement, in that subsequent prosecution is barred as long as the defendant has performed his obligation." *Kallberg*, 160 A.3d at 1042.

¶ 162     In the *Kallberg* case, the Connecticut Supreme Court found that there was an ambiguity as to whether the prosecutor "intended to enter unilateral nolles on three of the cases and effectuate a nolle agreement confined to only the drug case" and, if the intent of the prosecutor was to enter an agreement on the drug charge only, "it was incumbent on the prosecutor to make that explicit on the record." *Kallberg*, 160 A.3d at 1047. The court noted that, since the State is the drafter of the agreement and holds disproportionate power, any ambiguity is weighed in favor of the defendant. *Kallberg*, 160 A.3d at 1043. The court held that the State breached the *nolle* agreement and reversed the convictions and remanded the case for specific performance of the *nolle* agreement, namely not filing future charges on those matters. *Kallberg*, 160 A.3d at 1048.

¶ 163     Essentially, the *Kallberg* case stands for the proposition of fairness that, if the State makes a deal, it must stand by it. It is not a matter of guilt or innocence but holding the State to its bargain. The State has broad discretion in its disposition of a case, but once it negotiates a deal to nol-pros the charges, it cannot reinstate them. *Kallberg*, 160 A.3d at 1042. As a result, I find that Smollett entered into a *nolle* agreement, wherein the State agreed to nol-pros the case in exchange for him forfeiting his bond and completing community service. According to the record, at the time of the hearing the conditions appeared to be met to the State's satisfaction, and it entered the *nolle* pursuant to the agreement, barring it from future prosecution on the circumstances that led to those

charges. As stated in *Kallberg*, a unilateral *nolle* allows the State to refile charges because there is no agreement. However, a bilateral agreement binds the State because the defendant is giving up something of value in return for the complete resolution of his or her case. That is what occurred here. While that result may have appeared unjust to some, another trial court judge, unrelated to the proceedings, cannot unilaterally renege on the deal and grant the authority to a special prosecutor to violate a deal that bound the State. See *State v. Platt*, 783 P.2d 1206, 1206 (Ariz. Ct. App. 1989) (stating a deferred prosecution agreement "may not, however, be rescinded simply because the state, on reflection, wishes it had not entered into the agreement at all"). That does not just violate contract law but would be manifestly unjust and would make every agreement the State enters into with a defendant tenuous, leaving defendants wondering whether public outcry would destroy the carefully crafted negotiation with the State. See *People v. Starks*, 106 Ill. 2d 441, 449 (1985). Public policy considerations and reverence for our justice system disfavor reneging on such agreements and should never be outweighed by a cacophony of criticism as to the terms of the agreement.

¶ 164   Unlike the circumstances of unilateral *nolles*, the State, in this case, explicitly stated on the record that, "[a]fter reviewing the facts and circumstances of the case, including Mr. Smollett's volunteer service in the community and agreement to forfeit his bond to the City of Chicago, the State's motion in regards to the indictment is to nolle pros." After the State reviewed the case and Smollett completed 15 hours of community service, in addition to forfeiting his bond, the State nol-prossed the case. That was the agreement and different than the State simply entering a unilateral *nolle*.

¶ 165   Further, the evidence contained in the reports suggests the intention of the parties was more akin to a dismissal with prejudice. In the conversation the first assistant state's attorney had with

the chief deputy and chief ethics officer, he stated that the agreement with Smollett tracked with the DPP, implying that the agreement was a deferred prosecution. While the requirements were not the same as the DPP, the disposition tracked with the DPP, which provided for entry of *nolle prosequi* upon Smollett's successful completion of the requirements. Cook County Cir. Ct. G.A.O. 11-03 (Feb. 17, 2011) ("If the candidate successfully complies with all of the conditions of the agreement, the State's Attorney's Office shall motion the case up in Branch 9. The court shall be advised in the premises and the state shall nolle prosequi all charges against the candidate."); Cook County Cir. Ct. G.A.O. 11-06 (Feb. 28, 2011) (stating "[i]f the candidate successfully completes the program, his or her case will be *nolle prosequi* by the state's attorney"). While there is no appellate case in Illinois that specifically states this, it is *well established* that, if a defendant successfully completes the DPP, the Cook County State's Attorney's Office cannot reinstate the nol-prossed charges against the defendant. The fact that the State, which has broad discretion in the management of a criminal case, chose to pursue an informal or atypical deferred prosecution does not remove the restriction on the State to not prosecute again. See *People v. Hubbard*, 2012 IL App (2d) 120060, ¶ 23 (stating the State has exclusive discretion in the management of a criminal prosecution and is entrusted with using that discretion to determine the extent of societal interest in the prosecution).

¶ 166 Additionally, the assistant state's attorney's e-mail highlights that it was an informal deferred prosecution and meant to dismiss the charges against Smollett. In her request for dispositions of informal deferred prosecutions, she made it clear that the terms *nolle* and dismissal were interchangeable in her mind, resulting in a conclusion of the case nonetheless. However, if there is any question as to the scope of the agreement that took place, this court should remand the case for an evidentiary hearing as to the scope of the agreement that took place.

¶ 167   In *Starks*, 106 Ill. 2d 441, our supreme court reviewed whether the defendant entered into a pretrial agreement with the State wherein the charges would be dismissed if he passed a polygraph test. In that case, the first discussion on the record of the purported agreement did not occur until a hearing on a posttrial motion for a new trial. *Starks*, 106 Ill. 2d at 446. The trial court would not consider the argument of the pretrial agreement. *Starks*, 106 Ill. 2d at 445-46. On appeal, the defendant sought to supplement the record on appeal with an unsigned affidavit from his trial counsel, which the appellate court did not allow. *Starks*, 106 Ill. 2d at 446. However, as part of the posttrial hearing, the defendant testified that his understanding of the pretrial agreement was that, if he passed the polygraph test, the charges would be "drop[ped]." *People v. Starks*, 122 Ill. App. 3d 228, 232 (1983). Our supreme court ruled that there was not enough evidence in the record to establish that there was a pretrial agreement. *Starks*, 106 Ill. 2d at 446-47. While the supreme court did not place any value in the unsigned affidavit, it found that the testimony of the defendant was sufficient to merit an evidentiary hearing on whether an agreement took place. *Starks*, 106 Ill. 2d at 447-48. The court reasoned the hearing could be resolved by calling the assistant state's attorney assigned to the case or defendant's trial counsel to testify. *Starks*, 106 Ill. 2d at 448. The court subsequently stated that, if there was an agreement, the State would be bound to the agreement. *Starks*, 106 Ill. 2d at 452.

¶ 168   In this case, the trial court did not make a ruling on whether a pretrial agreement was in place but rather deferred to the ruling of Judge Toomin appointing a special prosecutor and empowering it to investigate the handling of the case and reindict Smollett if appropriate. As a result, it did not address *Starks*, 106 Ill. 2d at 452, which states that, if such an agreement is in place, the State is bound to its agreement. Unlike in *Starks*, 106 Ill. 2d at 448, the trial court did not conduct an evidentiary hearing on the motion, so there was no testimony from Smollett's trial

counsel, Smollett, or the assistant state's attorney who entered the *nolle*. If the majority has questions about the terms of the agreement, the appropriate prescribed solution, outlined in *Starks*, 106 Ill. 2d at 453, is to reverse the convictions and remand for an evidentiary hearing to ascertain the terms of the agreement and the parties' intent. At the conclusion of the hearing, if the trial court finds that the terms were not meant as a dismissal with prejudice, the convictions and sentence would be reinstated. *Starks*, 106 Ill. 2d at 453. The majority asserts that there are no questions raised, as Smollett bargained for and received a *nolle*, which did not bar a reinstatement of the charges.

¶ 169   While a defendant might appreciate the gift of a *nolle* when not part of underlying negotiations, why would a defendant bargain for uncertainty? When negotiating a disposition, a defendant is bargaining for the certainty that a plea, a cooperation agreement, or deferred prosecution agreement provides rather than rolling the dice with a trial. *Reed*, 2020 IL 124940, ¶¶ 25-27. From a public policy standpoint, if defendants knew that the State was not bound to its agreement when it enters a *nolle* on the top count of an indictment in a plea agreement, as the majority and the OSP suggest, it would likely erode the very foundation of plea negotiations. *Starks*, 106 Ill. 2d at 449 ("The prosecution must honor the terms of agreements it makes with defendants. To dispute the validity of this precept would surely result in the total nullification of the bargaining system between the prosecution and the defense."). For that reason, the intention of the parties is paramount (*People v. Donelson*, 2013 IL 113603, ¶ 18), and in this case, that intention is evident.

¶ 170   In the case before us, Smollett gave up something of value, community service and bond forfeiture, in exchange for a *nolle* of the whole indictment. To suggest that Smollett entered into the agreement without the mutuality of understanding that the *nolle* acted as a dismissal with

prejudice is to suggest either Smollett contracted for no guarantee or Smollett thought he was getting a dismissal when the State had no intention of dismissing the charges. That defies logic or suggests that the State engaged in a level of gamesmanship and bad faith that should be condemned. See *People v. Norris*, 214 Ill. 2d 92, 104 (2005) (finding that the State is not barred from reinstating nolled charges unless there is a showing of harassment, bad faith, or fundamental unfairness). The appointment of a special prosecutor to reindict Smollett after he had entered into a binding agreement, which he completed, with the State was fundamentally unfair. Additionally, it was common sense that Smollett was bargaining for a complete resolution of the matter, not simply a temporary one. See *McElroy v. B.F. Goodrich Co.*, 73 F.3d 722, 726 (7th Cir. 1996) ("There is no novelty in interpreting contractual language in the light of common sense.").

¶ 171   Contracts, in the criminal context, "contain implicit as well as explicit terms. [Citations.] Especially implicit terms necessary to head off absurdities." *United States v. Barnett*, 415 F.3d 690, 692 (7th Cir. 2005). "[A] contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002).

¶ 172   Even if the literal interpretation of the agreement was that the State would nol-pros the charges with the ability to reinstate the charges, that would lead to an absurd result. In circumstances where a defendant reaches an agreement with the State, he puts himself in a better position. The benefit that the majority mentions, the ability to move freely without having to appear in the future, is illusory at best. First, even if that were considered a benefit, it was one that could change immediately. While unusual, the State could have refiled charges that same day or the next. Second, that belies the fact that, under that alleged scenario, Smollett could have negotiated for a

final resolution of his case that removed the necessity to come back to court and eliminated the State's ability to reinstate charges. As shown, under the scenario where a *nolle* could be literally interpreted as a dismissal without prejudice, that would lead to an absurd result, which the parties are unlikely to have sought. *Beanstalk Group, Inc.*, 283 F.3d at 860. Therefore, the implicit term necessary to head off any absurdities is that the *nolle* operated as a dismissal with prejudice. *Barnett*, 415 F.3d at 692.

¶ 173 However, in actuality, there is no need to go into analysis of the implicit and explicit terms of the agreement because the intention of the State was plain. While the State could have exercised greater semantical precision on the record by stating that the case was terminated with no intention of refiling, from the record it is apparent that was its intent. Any argument that suggests that the State had no intention of dismissing this case, as a conclusion and disposition of the prosecution, fails. The intent of the prosecutor to exercise the authority of the State in crafting and tendering its agreed disposition to the trial court was evident. The prosecutor stated she believed "this outcome [was] a just disposition and appropriate resolution to this case." Merriam-Webster defines the term "disposition" as "the act or the power of disposing or the state of being disposed: such as" "final arrangement" or "settlement." See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/disposition (last visited Nov. 16, 2023) [https://perma.cc/KKW9-KPJ2]. Those words denote a finality that would not exist if the State merely sought to refile the charges. In reality, there is no indication in the record or in any brief that the Cook County State's Attorney's Office had any intention to reinstate the charges. However, the State could not have predicted the public outcry precipitating an unprecedented appointment of a special prosecutor who would violate its lawful agreement with impunity. Ordinarily, when the State disposes of a case, the case file stays within its exclusive control and possession. *Hubbard*, 2012 IL App (2d)

120060, ¶ 23. Based on the aforementioned analysis, I believe Smollett's convictions should be reversed and the case remanded for specific performance of the *nolle* agreement.

¶ 174   The matter boils down to one of procedural fairness. If a *nolle* agreement has no effect, the State can reinstate charges for any number of defendants for whom it has entered *nolles*. The OSP reports indicated that the Cook County State's Attorney's Office, in the 2 years prior to Smollett's disposition, had referred over 5000 individuals into the DPP. I have noted that the guidance from the administrative order is for the State to nol-pros the case after completion of the program. This opinion has the effect of scaring every defendant who entered the DPP and completed it successfully, that the State can reinstate charges against them as long as it does not run afoul of the statute of limitations. This does not just affect the defendants, as in most circumstances, the State contacts victims before entering into a deferred prosecution agreement with the defendants. As a result, this ruling could reopen cases that victims had thought were previously resolved. I would hope that the State, as by all accounts the Cook County State's Attorney's Office intended to do here, would stand by its agreements. However, this allows assistant state's attorneys to operate in a dishonorable way if they so choose. That sort of fundamental unfairness runs afoul of every notion of justice that this nation claims to represent. Rich or poor, famous or infamous—the State is called to prosecute everyone fairly and justly and not be swayed simply by public criticism. Unfortunately, this case shows that outcry from some members of the community and media pressure can lead to a dismantling of such an agreement between the State and a defendant.

¶ 175   I close my dissent with this admonishment by Justice Hutchinson from the Second District of the Illinois Appellate Court about the duties of prosecutors.

"Society reposes in its prosecutors an awesome and sacred trust. They alone possess the authority to institute the sole state-sanctioned process through which a citizen's liberty

and life may legally be ended. Not surprisingly, the grant of such staggering power carries with it commensurate responsibilities. Prosecutors have as their preeminent goal not victory, but justice. See, *e.g.*, *People v. Lyles*, 106 Ill. 2d 373, 411-12 (1985) (it is the prosecutor's responsibility to safeguard the constitutional rights of all citizens, including the defendant's); see also 145 Ill. 2d R. 3.8(b) (prosecutor must disclose exculpatory and mitigating evidence). Without a doubt, prosecutors must discharge their duties with vigor and zealousness. See *United States v. Young*, 470 U.S. 1, 7, 84 L. Ed. 2d 1, 7, 105 S. Ct. 1038, 1042 (1985); see also 134 Ill. 2d R. 1.1, Preamble to Illinois Rules of Professional Conduct. However, prosecutors who—blinded by this zealousness—lose sight of their ultimate goal breach both their ethical code and public trust. They do so at their peril." *People v. Weilmuenster*, 283 Ill. App. 3d 613, 626 (1996).

---

### *People v. Smollett*, 2023 IL App (1st) 220322

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-3050; the Hon. James B. Linn, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Nnanenyem E. Uche, of Uche P.C., and Heather A. Widell, both of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Dan K. Webb, Special Prosecutor, of Winston & Strawn, of Chicago (Sean G. Wieber and Samuel Mendenhall, of counsel), for the People. |

---

| | |
|---|---|
| *Amicus Curiae***:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, Stephen G. Collins, and Jane M. Chapman, Assistant Corporation Counsel, of counsel), *amicus curiae*. |